1997 ND 82

**In The Matter of the ESTATE OF Emanuel LUTZ, Deceased.**

**Lavilla LUTZ, Appellant,**

v.

**Ingrid SCHNEIDER and Edward Lutz, co-personal representatives of the Estate of Emanuel Lutz, Appellees.**

**Civil No. 960177.**

Supreme Court of North Dakota.

April 24, 1997.

Wheeler Wolf, Bismarck, for appellant; argued by Gregory C. Larson.

Zuger, Kirmis & Smith, Bismarck, for appellee Co-representatives Ingrid L. Schneider and Edward J. Lutz; argued by Rebecca S. Thiem.

Tschider & Smith, Bismarck, for appellee Estate; argued by Morris A. Tschider.

MESCHKE, Justice.

[¶ 1] Lavilla Lutz appeals two summary judgments, one dismissing her creditor's claim for her extraordinary services to Emanuel Lutz before his death, and another dismissing her petition for an elective share and exempt allowances from Emanuel's estate. Lavilla also appeals an order approving the distribution of Emanuel's estate. We reverse and remand for trial of Lavilla's claims and for reconsideration of distribution of the estate.

## I. Background

[¶ 2] Lavilla and Emanuel met in 1983 when she was age fifty-three and he almost sixty. Lavilla moved into Emanuel's home in 1985. They discussed marriage in 1987. Then, Emanuel said he wanted to leave the bulk of his property to his children and grandchildren, and he told Lavilla a premarital agreement would be needed for their marriage. According to Lavilla, however, Emanuel told her "there would still be something to take care of me anyway," and she expected him to do more than the premarital agreements assured.

[¶ 3] In May of 1987, Emanuel contacted attorney Morris Tschider to prepare a marriage agreement, consents to wills, and wills for Emanuel and Lavilla. Emanuel and Lavilla met with Tschider to discuss the documents, including Lavilla's will, prepared by Tschider. In Tschider's office, Lavilla reviewed a disclosure of financial information identifying Emanuel's assets and obligations.

[¶ 4] Before signing, Lavilla did not consult another attorney about their legal effect. According to Lavilla, she believed Tschider was acting as counsel for both herself and Emanuel. Tschider denies he acted as her attorney, and he asserts he told her to seek independent counsel. Emanuel and Lavilla signed the premarital agreement, consents to will, and wills on February 1, 1988. Emanuel and Lavilla married February 14, 1988.

[¶ 5] When Emanuel had heart trouble in 1991, Lavilla cared for him extensively for two months, and again when Emanuel began suffering from cancer in early 1994. After his cancer surgery in April, Lavilla increased her care, but he gradually recovered enough to take his own medication and dress himself. Lavilla drove Emanuel to Mayo Clinic in August 1994, where doctors said his condition was terminal. After they came home, Emanuel became very weak and begged Lavilla not to move him into a nursing home.

[¶ 6] From then on, Lavilla cared for Emanuel nearly around the clock until he died. Besides ordinary household tasks, her care included bathing and dressing Emanuel, helping him to the bathroom and his favorite chair, bringing him his food, and even feeding him. She took him to the doctor, picked up his prescriptions and, to give him pain medication, got up nearly every two hours each night.

[¶ 7] After nearly ten years together, Emanuel died on November 9, 1994.

## II. Decisions Appealed

[¶ 8] In the premarital agreements, Emanuel and Lavilla each waived any share in the other's estate "except as provided in their respective wills." They each specifically waived "all rights of [d]ower, courtesy, community property, homestead, inheritance, succession, surviving spouse or family allowance, exempt property, claims for support, alimony, attorneys' fees, costs of property settlement."

[¶ 9] Emanuel's will gave Lavilla certain property in Article II:

BEQUESTS TO SURVIVING SPOUSE: I give and bequeath to Lavilla [Lutz] the resident property used and occupied by us as a home if I be the owner thereof or have any interest therein at my death for the remainder of her natural life, or until she remarries. I further give and bequeath to Lavilla [Lutz], if she survives me, all furni-

ture and household items and all other tangible personal property located in or used in connection with my home including the family automobile. Any personal property listed in any handwritten instrument prepared by me, as hereinafter set forth, shall be excluded from this bequest. If Lavilla [Lutz] does not survive me all property items bequeathed under this Article shall become part of my residuary estate.

His residuary clause, Article III, directed:

RESIDUARY ESTATE: In the event Lavilla [Lutz] does not survive me, all of the rest and remainder of my property, whether real, personal or mixed, and wheresoever situated, I give, devise and bequeath as follows: to my children, to-wit, Ingrid L. Schneider and Edward J. Lutz, each an equal one-half (½) interest in and to the residue of my estate.

Emanuel's will named his two children as his personal representatives but, without explanation, his will was silent about disposition of the residue if Lavilla survived him.

[¶ 10] Lavilla filed a creditor's claim in Emanuel's estate for her extraordinary services to him while he suffered from heart disease and cancer. After his children disallowed her claim, Lavilla petitioned the trial court for compensation. His children moved for summary judgment, contending her services were gratuitous and not extraordinary. The trial court granted this motion because there was no evidence of an express agreement to compensate Lavilla for her services, and the court believed evidence about the type and degree of services for an implied agreement was missing.

[¶ 11] Lavilla petitioned for an elective share of Emanuel's estate as his surviving spouse, a family allowance, a homestead allowance, and an exempt property entitlement. The children moved for summary judgment, contending Lavilla had waived all those rights in the premarital agreements. Lavilla argued the premarital agreement was involuntary because she did not have independent legal counsel before signing and she was induced to sign by constructive fraud. She also urged the agreement was unconscionable for "harshness and one-sidedness."

The trial court concluded the premarital agreements were legally enforceable waivers of Lavilla's rights and not unconscionable, and granted summary judgment dismissing these claims by Lavilla.

[¶ 12] Later, Emanuel's children petitioned for approval of distribution of the estate, to distribute the household property and a life occupancy of half of Emanuel's duplex home to Lavilla, and to distribute the rest of the estate to themselves and their children. Lavilla objected, contending Emanuel's residuary gift to his children was inoperative because it took effect only if "Lavilla [Lutz] does not survive me." Since the residuary clause was ineffective, Lavilla argued she was entitled to half of the estate through the combined effect of the incomplete will and the intestacy laws.

[¶ 13] The trial court concluded the will was ambiguous because, while the introductory phrase of the residuary clause could be read to vest Lavilla with an intestate share, the court believed that would be inconsistent with what Article II specifically designated Lavilla was to get through the will. Relying on Lavilla's waiver of "all rights of ... inheritance" in the premarital agreements as extrinsic evidence of Emanuel's testamentary intent, the trial court concluded Emanuel had intended to "limit the devise to Lavilla and to provide for his children and grandchildren by devising everything not specified for Lavilla to them." The court approved the children's proposed distribution.

[¶ 14] Lavilla appealed the order for distribution and the two summary judgments. Under our mantra of review in *NDRCivP 56*, a summary judgment should be approved only when there are no genuine disputes about material facts. *Matter of Estate of Otto*, 494 N.W.2d 169, 171 (N.D.1992). The litigant moving for summary judgment has the burden of demonstrating no material facts are disputed. *Id.* In deciding a motion for summary judgment, a court must view the evidence in the light most favorable to the litigant resisting the motion, and give that party the benefit of all favorable factual inferences. *Kristianson v. Flying J Oil & Gas, Inc.*, 553 N.W.2d 186, 188 (N.D.1996). We reverse these summary judgments be-

cause we conclude genuine disputes about material facts exist on each claim.

### III. Extraordinary Services

[¶ 15] Lavilla contends the trial court erred in dismissing her compensation claim because her care "went beyond the general care one family member would generally provide to another gratuitously." Lavilla argues an implied agreement to compensate arose because her benefits from the marriage did not equal the value of her extraordinary services. She contends Emanuel's estate was enriched by her extensive services because she saved his estate the cost of institutional nursing care.

[¶ 16] The children argue her services were not extraordinary since volunteers and health aides helped her care for Emanuel near the end. The children urge that it is speculative to think the only alternative to Lavilla's care was institutional nursing care. They note Lavilla admitted she had not expected to be paid for her services. They contest any lack of mutuality because Lavilla received many lifetime benefits from the marriage.

[¶ 17] Ordinarily, someone who performs substantial services for another without an express agreement for compensation becomes entitled to the reasonable value of the services. *Matter of Estate of Raketti*, 340 N.W.2d 894, 901 (N.D.1983). When, however, services are performed by a family member in the same household, it is presumed that the services were gratuitous and that compensation was not intended. *Id. Compare* NDCC 14–07–05: "Any person after marriage has with respect to ... contracts ... the same capacity and rights and is subject to the same liabilities as before marriage, including liability to suit by his or her spouse."; *Riebe v. Riebe*, 252 N.W.2d 175, 178 (N.D.1977) (Spouses may contract with one another as if unmarried). Under *NDREv 301(a)*, a family claimant has the burden of overcoming the judicially fashioned presumption against compensation by proof that the services were extraordinary and not gratuitous.

[¶ 18] Prior North Dakota precedents applying the presumption against compensation for services by a family member were thoroughly analyzed in *Raketti*. We explained that "[o]nly where the services were of a particularly extraordinary nature did the Court find that the presumption had been overcome." 340 N.W.2d at 901. In *Raketti*, too, we emphasized that courts should consider all of the surrounding facts and circumstances, not only the degree and nature of the family relationship but also the lack of mutuality of benefits, a request for the help, and the degree of hardship on the care giver. *Id.* at 902. We stressed the factual nature of this inquiry:

> [T]he court should take into consideration *all* of the surrounding facts and circumstances when determining whether an agreement to pay should be implied. The central question presented in these cases is whether or not, under the facts and circumstances of each particular case, it would reasonably be expected that compensation would be paid. These cases will, of necessity, turn on the particular facts presented therein.

*Id.* This kind of factual inquiry is generally unsuitable for summary judgment.

[¶ 19] This trial court recognized: "The record makes clear that [Lavilla] provided considerable care for [Emanuel], particularly in the six months or so preceding his death. Her claim that he would have required nursing home care without the services she was providing is not refuted in the record." Still, the trial court reasoned:

> The record of this case does not support the conclusion that an implied agreement for compensation can be construed. The services provided by [Lavilla] were not of the type or degree referred to in *In Re: Estate of Thompson* [191 N.W.2d 578 (N.D.1971) ] except near the very end of [Emanuel's] lifetime. The mutuality of benefit concept when applied to the present case clearly indicates (by her testimony) that [Lavilla] derived considerable enjoyment from the marital relationship she shared with [Emanuel] until his death.

Although this might be one factual inference after a complete factual assessment, we dis-

agree with it as a legal conclusion. *See,* for example, *Bergerson v. Mattern,* 41 N.D. 404, 170 N.W. 877 (1918), affirming a jury verdict against a mother's estate for her daughter's exceptional services:

> Although the usual presumption is that services rendered by a child to its parents are acts of kindness and gratuitous and do not create by their rendition an implied promise to pay therefor, nevertheless, where the services rendered are so exceptional and peculiar and the surrounding circumstances such as to lead to the reasonable belief of an understanding that pecuniary compensation should be made, a contract to pay therefor may be implied.

*Id.* The conflicting evidence in this case created material factual disputes about whether Lavilla's services were so exceptional and lacking in mutuality as to imply a contract to pay her.

[¶ 20] Lavilla offered much evidence about the extraordinary nature of her extensive services to Emanuel in the last three years of a ten-year relationship. During his serious illnesses, she helped him for months with all his bodily and medical needs while he was very weak, including the basic functions of bathing, dressing, eating, and toileting. While assisting Emanuel physically, Lavilla claims she injured her back to an extent that now prevents her from fully supporting herself financially. This evidence on the degree of Lavilla's effort and hardship in caring for Emanuel necessitates factual findings.

[¶ 21] The children argue Lavilla admitted her services were gratuitous when she said in her deposition that she had not expected to be paid. But an isolated statement is not dispositive because her initial expectation, when her services started, may have changed over time. *See Matter of Estate of Zent,* 459 N.W.2d 795, 800 (N.D.1990) (girlfriend's statement, "I didn't ask for anything," did not prevent recovery on implied contract for extraordinary care of aging Alzheimer's patient in his home). According to Lavilla, Emanuel pleaded with her to make

sure he would not be put in a nursing institution, and she agreed. The effect of this request for her services and the extent of the mutuality of benefits are other factual factors to be weighed at a trial and, altogether, the factors here do not fit summary disposition.

[¶ 22] Viewing Lavilla's evidence in the light most favorable to her, as we must, summary judgment was inappropriate. We remand for trial her claim for extraordinary services.

## IV. Premarital Agreements

[¶ 23] In her premarital agreements with Emanuel, Lavilla waived any share of his estate "except as provided in" his will, including waiver of "all rights of . . . homestead, inheritance, succession, surviving spouse or family allowance, [and] exempt property." NDCC 30.1–05–04 [1] authorized such waivers:

> The right of election of a surviving spouse and the rights of the surviving spouse to homestead allowance, exempt property and family allowance, or any of them, may be waived, wholly or partially, before or after marriage, by a written contract, agreement, or waiver signed by the party waiving after fair disclosure. Unless it provides to the contrary, a waiver of "all rights" or equivalent language in the property or estate of a . . . prospective spouse . . . is a waiver of all rights to elective share, homestead allowance, exempt property, and family allowance by each spouse in the property of the other and a renunciation . . . *of all benefits* which would otherwise pass to him from the other by intestate succession or by virtue of the provisions *of any will executed before the waiver . . . .*

(our emphasis). This statute begins the analysis, but other statutes affect it, too.

[¶ 24] In the trial court, Emanuel's children argued for summary judgment because Lavilla had read a written disclosure of his $280,000 in assets before she signed the premarital agreements so she had received fair and reasonable disclosure as a matter of law.

---

1. NDCC 30.1–05–04 was originally enacted in 1973. 1973 N.D. Laws ch. 257, § 1. It was amended in 1993 to take effect on August 1, 1995. *See* 1993 N.D. Laws ch. 334, §§ 15, 51. Before that 1995 effective date, NDCC 30.1–05–04 was again amended and renumbered as NDCC 30.1–05–07, to take effect on January 1, 1996. *See* 1995 N.D. Laws ch. 322, §§ 3, 27.

Lavilla relies on the overlapping provisions of the Uniform Premarital Agreement Act, NDCC ch. 14–03.1, to assert that her premarital agreements were unenforceable and unconscionable.

[¶ 25] The Uniform Premarital Agreement Act, enacted in 1985, *see* 1985 N.D. Laws ch. 190, authorizes prospective spouses to contract the "rights and obligations of each of the parties in any of the property of either or both of them whenever and wherever acquired or located," the "disposition of property upon … death, or the occurrence or nonoccurrence of any other event," and the "making of a will … or other arrangement to carry out the provisions of the agreement." NDCC 14–03.1–03(a), (c), (e). A premarital agreement becomes effective upon marriage, NDCC 14–03.1–04, but several other parts of this Act affect the enforceability of a premarital agreement.

[¶ 26] Emanuel's children emphasize parts of NDCC 14–03.1–06:

**Enforcement.**

1. A premarital agreement is not enforceable if the party against whom enforcement is sought proves that:

    a. That party did not execute the agreement voluntarily; or

    b. The agreement was unconscionable when it was executed and, before execution of the agreement, that party:

        (1) Was not provided a fair and reasonable disclosure of the property or financial obligations of the other party;

        (2) Did not voluntarily sign a document expressly waiving any right to disclosure of the property or financial obligations of the other party beyond the disclosure provided; and

        (3) Did not have notice of the property or financial obligations of the other party.

2. If a provision of a premarital agreement modifies or eliminates spousal support and that modification or elimination causes one party to the agreement to be eligible for support under a program of public assistance at the time of separation or marital dissolution, a court, notwithstanding the terms of the agreement, may require the other party to provide support to the extent necessary to avoid that eligibility.

3. An issue of unconscionability of a premarital agreement is for decision by the court as a matter of law.

Lavilla argues, "[b]ecause of Lavilla's lack of independent representation …, [her] signing of the premarital agreement[s] cannot be deemed voluntary and is also unconscionable as a matter of law" under NDCC 14–03.1–06(3). Lavilla also stresses another section in the Act, one not derived from the Uniform Act, but unique to North Dakota's version:

**Enforcement of unconscionable provisions.** Notwithstanding the other provisions of this chapter, if a court finds that the enforcement of a premarital agreement would be clearly unconscionable, the court may refuse to enforce the agreement, enforce the remainder of the agreement without the unconscionable provisions, or limit the application of an unconscionable provision to avoid an unconscionable result.

NDCC 14–03.1–07. Lavilla contends "[t]he latter section overrides the former section regarding the issue and application of unconscionability," and insists the trial court should not have summarily concluded these premarital agreements were enforceable.

[¶ 27] Because enforceability of premarital agreements is a matter of first impression in North Dakota, Lavilla suggests we use the dual analysis often employed to evaluate commercial contracts for unconscionability: Procedural Unconscionability, focusing on unfair surprise, oppression, and inequality of bargaining power; and Substantive Unconscionability, focusing upon the harshness of the contract. *See Construction Associates, Inc. v. Fargo Water Equip. Co.*, 446 N.W.2d 237, 241 (N.D.1989); *In re Marriage of Spiegel*, 553 N.W.2d 309, 316 (Iowa 1996). Lavilla urges that these premarital agreements are unenforceable under both the procedural and substantive standards of NDCC 14–03.1–07, because "there was something wrong with the bargaining process and the agreement has terms that are unconscionable."

## A. Procedural Enforceability

[¶ 28] Lavilla contends these agreements were procedurally defective because she lacked independent counsel and because Emanuel induced her to sign it by falsely promising to take care of her "anyway." Lavilla argues she could not have signed voluntarily unless she understood her rights fully, and that depends on whether she had been adequately represented by an attorney. Emanuel's failure to keep his "anyway" promise in a relationship of mutual trust and confidence where he benefited disproportionately, Lavilla contends, was constructive fraud that should prevent enforcement of these agreements.

[¶ 29] Emanuel's children contend Lavilla had plenty of time to consult independent counsel between May 1987 when attorney Tschider sent out the prepared documents and February 1988 when they signed them. The children point out that Lavilla testified in her deposition that, during this time, she did not seek independent counsel nor consult with another attorney about the documents. The children summarized Lavilla's deposition testimony:

> (1) she read the marriage agreement before signing; (2) she understood the effect of the documents; (3) she was asked if she understood the documents by Morris Tschider; (4) she was asked if she had any questions by Morris Tschider; (5) she didn't ask any questions; (6) she was asked if she wanted to sign the document; and (7) she signed the document.

The children dispute Lavilla's deposition testimony that Tschider did not advise her to seek separate counsel with Tschider's deposition testimony "that he advised Lavilla that he could not represent her on the premarital agreement and consent to will and that she should obtain separate counsel." The children concede, however, that "for summary judgment, Lavilla's version of these facts [is] assumed to be true."

[¶ 30] A premarital agreement is not enforceable if the disadvantaged spouse did not execute it voluntarily. NDCC 14–03.1–06(1) directs: "A premarital agreement is not enforceable if the party against whom enforcement is sought proves that ... [t]hat party did not execute the agreement voluntarily." In holding this premarital agreement was voluntary and valid as a matter of law, the trial court reasoned: "Other than the inferences which [Lavilla] contends resulted from statements made by [Emanuel] prior to his death regarding 'taking care of her,' the record is devoid of any basis on which to conclude that the premarital agreements of the parties should be cast aside." We disagree. The trial court failed to recognize the factual dispute about whether Lavilla was adequately advised to obtain independent counsel.

[¶ 31] Although we have never decided whether a premarital agreement can be avoided for lack of counsel, several other states have. No state makes independent counsel an absolute requirement for validity. *Randolph v. Randolph*, 937 S.W.2d 815, 822 (Tenn.1996). Some states require at least an opportunity to consult with independent counsel, but do not require actual consultation. *McKee–Johnson v. Johnson*, 444 N.W.2d 259, 266 (Minn.1989); *Gant v. Gant*, 174 W.Va. 740, 329 S.E.2d 106, 116 (1985). Many states, however, treat the absence or presence of independent legal counsel as a factual factor in assessing the voluntariness of a premarital agreement. *Ex Parte Walters*, 580 So.2d 1352, 1354 (Ala.1991); *McHugh v. McHugh*, 181 Conn. 482, 436 A.2d 8, 12 (1980); *Matter of Estate of Benker*, 416 Mich. 681, 331 N.W.2d 193, 199–200 (1982); *Fletcher v. Fletcher*, 68 Ohio St.3d 464, 628 N.E.2d 1343, 1348 (1994); *Randolph*, 937 S.W.2d at 822; *Matter of Marriage of Matson*, 107 Wash.2d 479, 730 P.2d 668, 671 (1986); *Button v. Button*, 131 Wis.2d 84, 388 N.W.2d 546, 550–51 (1986); *see generally* Robert Roy, Annotation, *Enforceability of Premarital Agreements Governing Support or Property Rights Upon Divorce or Separation as Affected by Circumstances Surrounding Execution—Modern Status*, 53 A.L.R.4th 85 (1987 & Supp.1996). *Kahn v. Kahn*, 756 S.W.2d 685, 695 (Tenn.1988), said it clearly: "We hold that whether or not a wife should be explicitly advised about what she is giving up or should be urged and given full opportunity to seek independent counsel is a factual issue, in that it may be required in some circumstances and not in others."

[¶ 32] Lack of opportunity to consult independent counsel may be a factor in a fiduciary relationship. A fiduciary relationship is "something approximating business agency, professional relationship, or family tie impelling or inducing the trusting party to relax the care and vigilance ... ordinarily exercise[d]." *Asleson v. West Branch Land Co.*, 311 N.W.2d 533, 539 (N.D.1981) (quoting 37 C.J.S. Fraud § 2, p. 213 (1943)). A fiduciary relationship develops when someone is under a duty to act for, or to give advice to, another person upon matters within the scope of the relationship. Restatement (Second) of Torts § 874, cmt. a (1979). A fiduciary relationship generally arises from an unequal relationship between the parties. *Compare Land Office Co. v. Clapp–Thomssen Co.*, 442 N.W.2d 401, 406 (N.D.1989) (fiduciary relationship ordinarily does not exist when business persons deal at arm's length). For a fiduciary relationship, the superior party must have a duty to act in the dependent party's best interest. As *Production Credit Ass'n v. Ista*, 451 N.W.2d 118, 121 (N.D.1990), explained, whether a fiduciary relationship exists is generally a question of fact.

[¶ 33] An agreement to marry can create a fiduciary relationship between individuals if they do not deal at arms length. Persons contracting about marriage are sometimes mismatched in bargaining power and sophistication. *See Weber v. Weber*, 548 N.W.2d 781, 783 (N.D.1996) ("Property set-tlement agreements in divorce cases must be scrutinized for unconscionability. The review for unconscionability is not ended by finding a lack of a trust relationship between the parties."); *Crawford v. Crawford*, 524 N.W.2d 833, 836 (N.D.1994) ("Marriage involves a confidential relationship, and the law should not permit one marital partner to take 'unconscientious advantage' over the other through the trust which is part of that relationship."); Syllabus by the Court in *Barker v. Barker*, 75 N.D. 253, 27 N.W.2d 576, 577 (1947): "Ordinarily, and presumptively, a confidential relation exists between husband and wife, and generally business transactions between them will be deemed to be within the rule of confidential relations."

[¶ 34] Unlike many private contracts, the state has an interest in every marriage contract. We agree with the view that lack of adequate legal advice to a prospective spouse to obtain independent counsel is a significant factual factor in weighing the voluntariness of a premarital agreement.

[¶ 35] Indeed, adequate legal representation will often be the best evidence that a spouse signed a premarital agreement knowledgeably and voluntarily. Here, the evidence conflicts on whether Tschider actually advised Lavilla to obtain independent counsel.[2] Tschider testified he did. Lavilla, however, disputes this and testified she believed Tschider was her attorney and relied on him as an advisor.[3] Her belief is under-

---

2. Tschider's duty to Lavilla is detailed in NDRPC 4.3:

> In dealing on behalf of a client with a person who is not represented by counsel, a lawyer shall not state or imply that the lawyer is disinterested. When the lawyer knows or reasonably should know that the unrepresented person misunderstands the lawyer's role in the matter, the lawyer shall make reasonable efforts to correct the misunderstanding.

The commentary to this rule elaborates:

> This Rule prohibits a lawyer from misleading an unrepresented person as to the lawyer's role in a matter. An unrepresented person, particularly one not experienced in dealing with legal matters, might assume that a lawyer is disinterested in loyalties or is a disinterested authority on the law even when the lawyer represents a client. A lawyer also has an affirmative duty to clarify the lawyer's role to an unrepresented person when the lawyer knows or reasonably should know that the person misunderstands that role. During the course of a lawyer's representation of a client, the lawyer should not give legal advice to an unrepresented person other than the advice to secure counsel.

3. Tschider offered no documentation that he advised Lavilla to get independent counsel. To document the lawyer's role in this situation, attorneys can write a letter explaining their role as an advocate for their client, or require each spouse to sign a written waiver that they were advised to obtain independent counsel and expressly waived their right to do so. *See The Florida Bar v. Ward*, 472 So.2d 1159, 1162 (Fla.1985)(recognizing that only careful documentation of full disclosure and consent can clearly refute a charge of failure to fulfill the requirements of the ethical rules); *In re Altstatt*, 321 Or. 324, 897 P.2d 1164, 1167–68 (1995)(requiring written confirmation of disclosure to sat-

standable since Tschider also prepared her will.[4] Whether Tschider adequately advised Lavilla about his potential conflict of interest, her need to have independent counsel, and the effect of her consent to his dual representation are disputed material facts that preclude summary judgment.

[¶ 36] Emanuel's children contest Lavilla's claim of his constructive fraud for failing to fulfill his oral promise to take care of her "anyway." Any amendment to a premarital agreement must be in writing, they argue, citing NDCC 9–06–07 (a written agreement supersedes any oral negotiations), and NDCC 14–03.1–05 (a premarital agreement may only be amended or revoked by a signed written agreement). They argue, "if an intent to deceive is absent, a promise to do something in the future cannot be considered fraud." Urging that "Lavilla does not allege that Emanuel made any misrepresentations about past or existing facts," Emanuel's children contend he did not mislead Lavilla "by promising to take care of Lavilla outside of the marital agreement and then failing to do so."

[¶ 37] However, parol or extrinsic evidence can be used to show that a contract has no effect because of fraud, illegality, or mistake, or to show that the contract was only partially integrated because essential elements were not reduced to writing. *Mau v. Schwan*, 460 N.W.2d 131, 134 (N.D.1990). The factual circumstances of an unfulfilled oral promise would be additional evidence on the voluntariness of the premarital agreements, and leaves an additional factual dispute for trial. *See* NDCC 9–03–08(2)(fraud by a contracting party who makes a "positive assertion, in a manner not warranted by the information of the person making it, of that

which is not true though he believes it to be true" to induce another to enter into the contract); *Barker*, 27 N.W.2d 576 (husband abused confidential relation with spouse by secretly acquiring title to home in his name alone); *Bourgois v. Montana–Dakota Utilities Co.*, 466 N.W.2d 813, 818 (N.D.1991)(recognizing a statutory claim for relief based on negligent misrepresentation).

[¶ 38] We reverse the summary judgment and remand for trial of the factual questions on the voluntariness and enforceability of these premarital agreements.

### B. Substantive Enforceability

[¶ 39] Even if a premarital agreement has been validly and voluntarily obtained, its substantive effect may be unconscionable and thus unenforceable. Under NDCC 14–03.1–06(3), the substantive enforceability of these premarital agreements is a matter of law to be decided by the court.

[¶ 40] Lavilla contends these premarital agreements were substantively unconscionable for their "harshness and one-sidedness." Lavilla values the decreed distribution to her of the "right of occupancy of residence-main floor unit[ ]" of the duplex at $30,000, the household goods at $3,000, their joint bank account at $2,000, and the auto at $400, for a total of $35,400. Lavilla compares her estimated $35,400 distribution to the $280,000 in assets Emanuel disclosed to her in 1987. Lavilla contends this is "less than 13% of Emanuel's estate" and "is certainly a low percentage based on the length of marriage and time that Lavilla committed to the marriage in caring for Emanuel and providing companionship." Lavilla thus argues the trial court should have declined to enforce the premarital agreements because they "will vi-

---

isfy full disclosure requirements of ethical rules); *see also* NDRPC 1.5 cmt. ("A written statement concerning the fee reduces the possibility of misunderstanding.").

4. Tschider's preparation of Lavilla's will indicates he represented her in part, and raises the possibility of a conflict of interest under NDRPC 1.7(a). *See* NDRPC 1.7 cmt., "Other Conflict Situations," recognizing the possibility of conflict when preparing wills for husband and wife. Again, documentation is the best evidence; parol evidence will often leave a question of fact as in

this case. *See* 2 Ronald E. Mallen & Jeffrey M. Smith, *Legal Malpractice* § 15.14, at 371 (4th ed.1996)(describing the advantages of obtaining written consents before representing conflicting interests); *see also Matter of Disciplinary Proceedings Against Wildermuth*, 141 Wis.2d 679, 416 N.W.2d 607, 611 (1987)(noting new rule requiring written consent to representation of conflicting interests and recommending written consultation along with written consent); Cal. R.P.C. 3–310(C)(1)(requiring informed written consent before an attorney can represent persons with potentially conflicting interests).

olate public policy by allowing Emanuel's heirs to take an estate worth approximately $300,000 (or larger because of appreciated value) and leave Lavilla with only a life estate in the home, household belongings, a small bank account and a used car."

[¶ 41] Emanuel's children question the $30,000 value Lavilla places on her lifetime occupancy of the "residence-main floor unit[ ]," but we observe it was not separately evaluated in the filed inventory and appraisement, nor was the value determined by the trial court. Anyway, the children insist, a court "need not determine the appropriate values to determine whether this agreement is unconscionable as a matter of law." The children say that Lavilla and Emanuel "were only married for six years at the time of his death and . . . after Emanuel had acquired all the assets that are the subject of this estate," and that Lavilla knew that it "was a condition of their marriage" for his property "to go to his children and grandchildren."

[¶ 42] Lavilla mainly contends her outlined financial circumstances will force her onto public assistance. NDCC 14-03.1-06(2) authorizes, "[i]f . . . a premarital agreement modifies or eliminates spousal support and that modification . . . causes one party . . . to be eligible for support under a program of public assistance at the time of separation or marital dissolution, a court, notwithstanding . . . the agreement, may require the other party to provide support to the extent necessary to avoid that eligibility."[5] Without any conflicting evidence, Lavilla's affidavit would permit an inference of her need for public assistance in the near future.

[¶ 43] Lavilla's affidavit said, "based upon the reduced amount of my social security and lack of other substantial assets received from Emanuel[ ] Lutz's estate, I expect to soon have to seek some type of public assistance." The children did not submit any affidavit or other evidence to dispute Lavilla's, but simply argue here that NDCC 14-03.1-06(2) does not apply because "[t]his subsection only applies if a party to a premarital agreement is eligible for public assistance 'at the time of separation or marital dissolution,'" and "[t]here is no reference in this section to death."

[¶ 44] However, the Prefatory Note to the Uniform Premarital Agreement Act, the identically worded source of NDCC 14-03.1-06(2) explains:

[I]f a provision of a premarital agreement modifies or eliminates spousal support, and that modification or elimination would cause a [spouse] to be eligible for support under a program of public assistance at the time of separation, marital dissolution, *or death*, a court is authorized to order the other party to provide support to the extent necessary to avoid that eligibility.

9B U.L.A. 370 (1987)(our emphasis). In view of her undisputed affidavit, whether Lavilla's financial circumstances will actually make her eligible for public assistance is a factual inquiry that precludes summary judgment in this case. While unconscionability of a premarital agreement is a matter of law to be decided by the court, NDCC 14-03.1-06(3), a conclusion of unconscionability necessarily turns on factual findings about the relative property values, Lavilla's other financial circumstances, and her ongoing needs.

[¶ 45] Also, "[n]otwithstanding the other provisions of" NDCC ch. 14-03.1, if the trial court "finds that the enforcement of [these]

---

5. NDCC 30.1-05-04, the section on waiver of rights by a surviving spouse in the Probate Code when Emanuel died, did not mention the effect of forced public assistance on the enforceability of a waiver. In 1993, however, this section was amended to create a protection for a waiving spouse similar to NDCC 14-03.1-06(2), effective August 1, 1995. *See* 1993 N.D. Laws ch. 334, §§ 15, 51. That amendment, at subsection 2(a), declared a surviving spouse's waiver not enforceable upon proof that "The waiver, if given effect, would reduce the assets or income available to the surviving spouse to an amount less than those allowed for persons eligible for a program of public assistance." Before that amendment took effect, section 30.1-05-04 was replaced by NDCC 30.1-05-07, effective January 1, 1996. *See* 1995 N.D. Laws ch. 322, §§ 3, 27. NDCC 30.1-05-07(2)(a) now makes a spouse's waiver unenforceable when "The waiver, if given effect, would reduce the assets or income available to the surviving spouse to an amount less than those allowed for persons eligible for medical or other forms of assistance from any state or federal government or governmental agency for which the surviving spouse must qualify on the basis of need."

premarital agreement[s] would be clearly unconscionable," the trial court "may refuse to enforce the agreement[s], enforce the remainder of the agreement[s] without the unconscionable provisions, or limit the application of an unconscionable provision to avoid an unconscionable result." NDCC 14–03.1–07. This additional standard for when premarital agreements are "clearly unconscionable," supplements the standards in NDCC 14–03.1–06 and, together, they require complete factual findings about the relative property values, Lavilla's other resources, and her foreseeable needs.

[¶ 46] We remand for trial of whether Lavilla procedurally executed these premarital agreements voluntarily and whether they are unconscionable in their substantive application to her.

*V. Estate Distribution*

[¶ 47] Lavilla argues the trial court erred in approving the children's proposed estate distribution because she believes the will is not ambiguous. She objects to the court's conclusion that her specific bequests in Article II and the incomplete disposition in the Article III residuary clause are inconsistent. Lavilla asserts the residuary clause's condition, "[i]n the event Lavilla [Lutz] does not survive me," is clear and unambiguous. Since she survived Emanuel, she insists the residuary clause is ineffective and she is accordingly entitled to an intestate share of Emanuel's estate. She contends the court modified the will by concluding there was an ambiguity and then used extrinsic evidence to rewrite the will.

[¶ 48] How courts must construe a will was recently summarized in *Matter of Estate of Fern L. Brown*, 1997 N.D. 11, ¶ 15, 559 N.W.2d 818:

> Courts must construe a will to find the testator's intent from full consideration of the will in light of surrounding circumstances. Whether an ambiguity exists in a will is a question of law for the court to decide. A will is ambiguous only if it has more than one reasonable interpretation. If a will is ambiguous, extrinsic evidence can be used to aid in clarifying the ambiguity. As we [have] held, resolution of an ambiguity by extrinsic evidence is a finding of fact that will not be set aside unless it is clearly erroneous.

(citations omitted). Here, the trial court primarily used the premarital agreements as controlling extrinsic evidence of Emanuel's intent in order to resolve a perceived ambiguity in favor of his children. Because the trial court's analysis was based on agreements that may or may not be enforceable after a trial on remand, we reverse the court's construction of the will and its order approving the children's proposed estate distribution, and we remand for interpretation of the will after the trial on the enforceability of the premarital agreements.

[¶ 49] Even if the premarital agreements are enforceable, the trial court should be mindful that the premarital agreements permitted Emanuel to give Lavilla *more* property under a will than the minimum he agreed to in the premarital agreements. A spouse who has entered into a premarital agreement remains free to give a surviving spouse more than the agreed minimum either by will or agreement later. *See* 41 Am.Jur.2d *Husband and Wife* § 123 (1995); *Coffman v. Adkins*, 338 N.W.2d 540, 543 (Iowa.Ct.App.1983)("It may not be entirely logical for a man to enter into a contract to keep his property separate from his wife's and then transfer it into joint tenancy with her, but that does not constitute a legal basis on which this court could void a transfer freely made."); *Estate of Strickland*, 181 Neb. 478, 149 N.W.2d 344, 354 (1967)(widow, who had agreed before marriage to receive nothing from husband's estate on his death, was entitled to bequest made in his later will). Here, Lavilla did not waive any gifts made by Emanuel's will because the premarital agreements excepted what was "provided in their respective wills."

[¶ 50] If the trial court finds the premarital agreements were voluntary, then it must also consider them for the substantive elements of unconscionability under NDCC ch. 14–03.1. If the premarital agreements are either unenforceable or unconscionable, however, the trial court must reconsider the interpretation of Emanuel's will accordingly. *Com-*

*pare Matter of Estate of Ruben J. Peterson, Deceased,* 1997 ND 48, ¶¶ 11–14, 561 N.W.2d 618 (Although P.O.D. designation may not be altered by will, testamentary intent should not be thwarted by apparent mistaken assumption). Although the invalid premarital agreements would not be controlling, they nevertheless may be some evidence of Emanuel's testamentary intent.

[¶ 51] If the premarital agreements are unenforceable or unconscionable, Lavilla may or may not be entitled by intestacy to inherit half of the intestate estate, *see* NDCC 30.1–04–02(4)(1994), but she would likely be entitled to an elective share of one-third of the augmented estate. *See* NDCC 30.1–05–01(1)(1994).[6] She would also likely be entitled to her family allowance, homestead allowance, and exempt property entitlement. *See* NDCC 30.1–07–01 (1994)(Exempt property); NDCC 30.1–07–02 (1994)(Family allowance); NDCC 47–18–01 (Homestead exemption). On the other hand, if Lavilla's premarital agreements are valid, enforceable, and not unconscionable, her waiver of rights to an intestate share and to elective and exempt shares will prevent Lavilla from receiving more from Emanuel's estate than express gifts to her in his will.

[¶ 52] In that event, the interpretation of "the resident property" gift to Lavilla in Article II may become important. They lived in half of a duplex, and Emanuel rented out the other half. Emanuel gave Lavilla "the resident property used and occupied by us as a home ... for the remainder of her natural life, or until she remarries." Lavilla contends in this appeal, since the "duplex has one legal description and is therefore one resident property," she should also "have the right to use, occupy and take the income from all of the duplex for the remainder of her life or until she remarries." Emanuel's children insist "there are two residences and two street addresses located on the property and that Lavilla has only resided at" one of them, so she cannot claim the other one. Since the income from the rental half of the duplex is used to pay the mortgage on the whole, and the mortgage payment exceeds the income received from the rental side, Emanuel's children argue there is no basis for Lavilla claiming the entire duplex as a testamentary gift.

[¶ 53] Because the trial court did not explain the reason why it approved the children's proposed distribution to Lavilla of only a "right of occupancy of residence-main floor unit[ ]," and did so without any provision for the mortgage, taxes, and other common expenses for the property, the trial court may also have to re-visit and resolve ambiguities about this gift in Emanuel's will to finally approve distribution of his estate.

*VI. Conclusion*

[¶ 54] We reverse both summary judgments because material facts are genuinely disputed. On remand, the trial court should hold a trial to decide Lavilla's claims against the estate.

[¶ 55] We also reverse the order approving the distribution of Emanuel's estate. After resolution of Lavilla's other claims, the trial court should again address interpretation of the will and decide the distribution of the estate.

[¶ 56] NEUMANN, MARING, JJ., and JAMES A. WRIGHT, District Judge, and SANDSTROM, Acting C.J., concur.

[¶ 57] JAMES A. WRIGHT, District Judge, sitting in place of VANDE WALLE, C.J., disqualified.

---

**6.** Effective January 1, 1996, a surviving spouse is now entitled by intestacy to the first $100,000 of the intestate estate and half of the remaining balance. NDCC 30.1–04–02(4); 1993 N.D. Laws ch. 334, § 4; 1995 N.D. Laws ch. 322, § 27. A surviving spouse is also now entitled to an elective share of one-half of the augmented estate. NDCC 30.1–05–01(1); 1993 N.D. Laws ch. 334, § 15; 1995 N.D. Laws ch. 322, §§ 3, 27.