2004 ND 5

**Ruth BINEK, Plaintiff and Appellant**

v.

**Theodore J. BINEK, Defendant and Appellee.**

**No. 20030154.**

Supreme Court of North Dakota.

Jan. 14, 2004.

Loren C. McCray, Beulah, ND, for plaintiff and appellant.

Timothy A. Priebe, Mackoff, Kellogg, Kirby & Kloster, P.C., Dickinson, ND, for defendant and appellee.

VANDE WALLE, Chief Justice.

[¶ 1] Ruth Binek appealed from a divorce judgment enforcing a premarital agreement between her and Theodore Binek and denying her request for spousal support. We affirm the trial court's decision enforcing the premarital agreement, and reverse and remand for further consideration regarding spousal support.

I

[¶ 2] Ruth and Theodore Binek were married on June 21, 1984. At the time of the marriage, Ruth Binek was fifty-two years old and Theodore Binek was sixty-one years old. It was the second marriage for both parties, and both had children from their prior marriages. Theodore Binek's net worth was approximately $600,000 and Ruth Binek's net worth was approximately $30,000. Theodore Binek presented a premarital agreement to Ruth Binek two days before the wedding by leaving it on a table at his home. The agreement was discovered by Ruth Binek and her sister, Lorraine Angelottie. It mutually excluded each party from any property not brought into the marriage by that party, and required Theodore Binek to "provide usual and reasonable maintenance and support" during the marriage. It defined the "interest which each shall have in the estate of the other during the marriage and after the death of either one of them," and stated Ruth Binek would release all rights in Theodore Binek's property or estate which she might have by reason of their marriage. Theodore Binek stated he would not marry Ruth Binek if she did not sign the agreement. Both parties signed the agreement. Theodore Binek was represented by counsel at the time of the signing, but Ruth Binek was not.

[¶ 3] Throughout the marriage, the parties abided by the terms of the agree-

ment. The parties did not commingle their assets. Theodore Binek continued working at the Binek coal mine and Ruth Binek was a homemaker. Theodore Binek paid for most of the living expenses of the parties. In May 2002, Ruth Binek sought a divorce based on irreconcilable differences. At the time of trial, Theodore Binek was eighty-one years old and Ruth Binek was seventy-two years old. Theodore Binek's net worth was approximately $200,000 and Ruth Binek's $30,000 had been depleted as a result of loans made to her relatives, which she claims are not collectible. Ruth Binek is receiving $391 per month in social security and $300 per month in interim spousal support. Theodore Binek is retired and his income consists of approximately $900 per month in social security payments, $1,000 per year from rental property, and $2,000 to $3,000 per year from his photography hobby. The trial court granted Ruth Binek a divorce. It enforced the premarital agreement and awarded Ruth Binek all the household goods in her possession and the accounts receivable for the loans to her relatives. Theodore Binek was awarded all the other property listed by the parties on the Property and Debt Listing. Neither party was awarded spousal support. On appeal, Ruth Binek contends the premarital agreement should not have been enforced and she should have been awarded spousal support.

## II

[¶ 4] The enforceability of the premarital agreement between Ruth Binek and Theodore Binek is governed by common law. Although North Dakota adopted the Uniform Premarital Agreement Act ("UPAA") in 1985, it does not apply to this situation because it was enacted after the parties entered into the agreement and does not contain a provision declaring it applies retroactively. *See* N.D.C.C. ch. 14–03.1; N.D.C.C. § 1–02–10.

[¶ 5] This Court has previously addressed the enforceability of premarital agreements entered into prior to the UPAA in cases involving the rights of a surviving spouse. *First Am. Bank W. v. Michalenko,* 501 N.W.2d 330, 333–34 (N.D. 1993) (addressing the widow's claim the trial court erred by instructing the jury that she had the burden to prove the premarital agreement was invalid); *Charlson v. Charlson,* 50 N.D. 677, 688–89, 197 N.W. 778, 781 (1924). In a decision prior to *Charlson,* the Court stated:

whether or not an antenuptial contract is valid depends largely, if not altogether, on the attendant circumstances and conditions under which it is executed. If it is fair, reasonable, equitable, and just and in no way contravenes public policy, and it is fairly entered into, each having knowledge of its contents and knowledge of each other's property, we think that it might be legally entered into, and thus be a binding obligation of the parties.

*Herr v. Herr,* 45 N.D. 492, 496, 178 N.W. 443, 444 (1920). Applying a similar rationale, the *Charlson* court concluded it was proper for the trial court to consider the following when evaluating a premarital agreement:

whether the contract had been entered into with the utmost good faith; whether it was reasonable in its provisions; whether the prospective wife possessed full knowledge of the character and value of her intended husband's property or was chargeable with such knowledge; whether the prospective husband informed his fiancee fully with respect to all facts concerning his property; whether the antenuptial contract provided any reasonable provisions for the support of the wife in case of her survival; whether, upon all of the surrounding circum-

stances, the provisions made for the wife in the contract were grossly disproportionate to the means of the husband; and whether such inadequacy of provision in the contract was sufficient under all the circumstances to raise a presumption of fraudulent concealment that was not overcome by the proof in the record sufficient to show its absence.

50 N.D. 677, 689–90, 197 N.W. 778, 781; *see also Michalenko,* at 334 & n. 3.

### A.

[¶ 6] Ruth Binek argues the agreement should not be enforced. She contends she did not enter into it voluntarily, it is unconscionable, and it does not apply to dissolution of the marriage by divorce. In effect, Ruth Binek contends the agreement is unenforceable because it is procedurally and substantively unfair. In evaluating premarital agreements governed by N.D.C.C. ch. 14–03.1 we have applied a similar analysis. *See In re Estate of Lutz,* 1997 ND 82, ¶¶ 27–46, 563 N.W.2d 90 (*"Lutz I "*). Although this agreement is not subject to the requirements of N.D.C.C. ch. 14–03.1, case law evaluating agreements governed by that chapter is relevant to the extent it addresses the requirements imposed by the common law.

[¶ 7] Procedurally, Ruth Binek contends she did not enter into the agreement voluntarily because it was presented to her two days before the wedding and Theodore Binek stated he would not marry her if she did not sign it; she was not represented by independent counsel; and she did not receive full financial disclosure. Although it would have been preferable to present the agreement to Ruth Binek more than two days before the wedding, this alone does not render the agreement unenforceable. Nor does the fact Theodore Binek would not have proceeded with the marriage make the agreement proce-

durally unfair. The purpose of the agreement was to keep the parties' property separate. When, as is the case here, the parties have been previously married and divorced, it is reasonable for one or both of them to seek protection of their property in a subsequent marriage.

[¶ 8] The significance of the presentation and signing of the agreement is more relevant in determining whether Ruth Binek understood the agreement and had an opportunity to obtain independent legal advice.

> An agreement to marry can create a fiduciary relationship between individuals if they do not deal at arms length. Persons contracting about marriage are sometimes mismatched in bargaining power and sophistication.
>
> Unlike many private contracts, the state has an interest in every marriage contract. We agree with the view that lack of adequate legal advice to a prospective spouse to obtain independent counsel is a significant factual factor in weighing the voluntariness of a premarital agreement.
>
> Indeed, adequate legal representation will often be the best evidence that a spouse signed a premarital agreement knowledgeably and voluntarily.

*Lutz I,* 1997 ND 82, ¶¶ 33–35, 563 N.W.2d 90 (citations omitted). However, "the presence of independent counsel is not a prerequisite to enforceability." *In re Estate of Lutz,* 2000 ND 226, ¶ 17, 620 N.W.2d 589 (*"Lutz II "*). The parties' marriage took place on Thursday, June 21, 1984. Ruth Binek testified Theodore Binek did not do anything to prevent her from consulting an attorney or asking questions prior to signing the agreement. She testified she understood the purpose of the agreement was Theodore Binek's property would remain his and her property would remain hers and, if the parties

had gotten divorced after one year, she would have abided by the agreement. Additionally, she testified it was entirely her decision whether to sign the agreement and she voluntarily did so. We conclude Ruth Binek was not deprived of an opportunity to consult independent counsel and understood the effect of the agreement when she signed it.

[¶ 9] Ruth Binek contends the agreement should not be enforced because Theodore Binek did not fully disclose the extent of his assets to her before she signed the agreement. The agreement contains a full disclosure clause which states, "each party is possessed of real and personal properties, the nature and extent of which has been fully disclosed by each to the other." In other jurisdictions, a full disclosure clause has been held to create a rebuttable presumption of full disclosure. *See Simeone v. Simeone*, 525 Pa. 392, 581 A.2d 162, 167 (1990). In the present case, Ruth Binek testified that before she signed the agreement she knew Theodore Binek owned the Binek coal mine and the equipment thereon, guessed he owned his house, and had been told by her family that he was worth over a million dollars. Further, she testified that Theodore Binek stated he had $600,000; she knew he was worth a substantial amount of money; and she "knew he owned more than [she] did." She later testified that she did not know how much Theodore Binek was worth at the time of the marriage, but discovered he was worth $600,000 based on the papers provided in connection with the divorce proceeding. Based on this testimony, we conclude Ruth Binek was sufficiently aware of Theodore Binek's financial situation when she signed the agreement. Therefore, we hold the premarital agreement was entered into fairly.

[¶ 10] Substantively, Ruth Binek contends the agreement is unconscionable because she did not receive full financial disclosure and the effect of enforcing it is to place her on public assistance. Ruth Binek's contention that the agreement is unconscionable because Theodore Binek did not provide a full financial disclosure is not convincing based on our conclusion that Ruth Binek was sufficiently aware of Theodore Binek's financial situation. Unconscionability of a premarital agreement is a matter of law, but it turns on factual findings related to the relative property values, the parties' financial circumstances, and their ongoing need. *Lutz I*, 1997 ND 82, ¶ 44, 563 N.W.2d 90. Under the UPAA, if a premarital agreement causes a party to be eligible for public assistance by eliminating or modifying spousal support, a court may require the other party to provide support to the extent necessary to avoid eligibility of the other for public assistance. *Id.* (citing N.D.C.C. § 14–03.1–06(2)).

[¶ 11] Unconscionability has been considered at various times in cases governed by the UPAA. *Lutz II*, 2000 ND 226, ¶ 25, 620 N.W.2d 589. North Dakota case law regarding premarital agreements entered into prior to adoption of the UPAA did not address when unconscionability should be considered. Courts applying the common law have considered unconscionability of a premarital agreement at both the time of execution of the agreement and the time of dissolution of the marriage. *See McKee–Johnson v. Johnson*, 444 N.W.2d 259, 267 (Minn.1989) ("[I]f the premises upon which [challenged provisions of premarital agreements] were originally based have so drastically changed that enforcement would not comport with the reasonable expectations of the parties at the inception to such an extent that to validate them at the time of enforcement would be unconscionable").

[¶ 12] This agreement was not unconscionable at the time it was executed. It

provided a means for Ruth Binek to keep her own assets and allow them to grow, and Theodore Binek was obligated to support Ruth Binek throughout the marriage. The agreement is not unconscionable at the time of enforcement because it did not govern the parties' rights regarding spousal support. Additionally, the parties' assets decreased throughout the marriage and there is no convincing evidence of economic fault by either party. By not addressing spousal support and allowing Ruth Binek to keep her assets separate from Theodore Binek's, the agreement created enough leeway to avoid an unconscionable result based upon the parties' circumstances at the time of dissolution. We hold this premarital agreement is not unconscionable.

## B.

[¶ 13] Ruth Binek contends the agreement does not apply to a dissolution of the marriage by divorce. A premarital agreement is a contract and its interpretation is a question of law for the court to decide. *In re Estate of Zimmerman*, 1998 ND 116, ¶ 13, 579 N.W.2d 591. Contracts are to be interpreted in a manner that gives effect to the parties' mutual intent at the time of contracting. N.D.C.C. § 9–07–03.

"When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone if possible...." N.D.C.C. § 9–07–04. "Construction of a written contract is a question of law." *Garofalo v. Saint Joseph's Hospital*, 2000 ND 149, ¶ 7, 615 N.W.2d 160. "If the intent of the parties can be ascertained from the agreement alone, interpretation of the contract is a question of law." *Id.* "Whether a contract is ambiguous is a question of law." *National Bank of Harvey v. International Harvester Co.*, 421 N.W.2d 799, 801 (N.D.1988). "A contract is ambiguous when rational arguments can be made for different positions about its meaning." *Id.* "Extrinsic evidence is properly considered only if the language of the agreement is ambiguous and the parties' intentions cannot be determined from the writing alone." *Miller v. Schwartz*, 354 N.W.2d 685, 689 (N.D.1984). "On appeal, this [C]ourt will independently review the contract to determine whether it is ambiguous." *International Harvester*, at 801.

*Meide v. Stenehjem*, 2002 ND 128, ¶ 7, 649 N.W.2d 532.

[¶ 14] The agreement provided:

Ruth Mayer hereby releases all rights in the property or estate of Theodore J. Binek which she might have by reason of their marriage, whether by way of dower, statutory allowance, widow's allowance, intestate share, or election to take against his will, under the laws of this or any other jurisdiction that may be applicable, and with particular reference to Section 30.1–05–04, North Dakota Century Code, as amended.

Theodore Binek released the same rights in Ruth Binek's property. This language is not ambiguous. Ruth Binek released all rights she had in Theodore Binek's property which arose out of the marriage. Any rights in the property she would acquire as a result of a property settlement upon divorce would be rights arising out of the marriage. Therefore, the agreement applies to property rights Ruth Binek may have acquired from a divorce decree.

[¶ 15] For the reasons stated, we affirm the trial court's decision enforcing the premarital agreement.

## III

[¶ 16] Ruth Binek contends the trial court erred by failing to award

her spousal support. Spousal support determinations are findings of fact and will not be reversed on appeal unless they are clearly erroneous. *Peters–Riemers v. Riemers*, 2002 ND 72, ¶ 26, 644 N.W.2d 197. The *Ruff–Fischer* guidelines require a trial court to evaluate the following in deciding whether spousal support should be awarded:

> "the respective ages of the parties, their earning ability, the duration of the marriage and conduct of the parties during the marriage, their station in life, the circumstances and necessities of each, their health and physical condition, their financial circumstances as shown by the property owned at the time, its value at the time, its income-producing capacity, if any, whether accumulated before or after the marriage, and such other matters as may be material." *Weir v. Weir*, 374 N.W.2d 858, 862 (N.D.1985).

*Lill v. Lill*, 520 N.W.2d 855, 856 (N.D. 1994). An award is based on the needs of the disadvantaged spouse and the supporting spouse's needs and ability to pay. *Kautzman v. Kautzman*, 1998 ND 192, ¶ 19, 585 N.W.2d 561. Detailed findings of fact are not required if the trial court's reasons for its decision regarding support can be determined. *Wolf v. Wolf*, 557 N.W.2d 742, 744 (N.D.1996).

[¶ 17] From this record, we cannot determine whether the trial court denied Ruth Binek spousal support because of the premarital agreement or the *Ruff–Fischer* guidelines. We conclude the agreement only affects distribution of the couple's property in the form of a property distribution as a result of divorce and does not preclude an award of spousal support. Therefore, we reverse and remand this issue to the trial court for further findings regarding spousal support. On remand, the trial court must consider whether Ruth Binek is entitled to spousal support under the *Ruff–Fischer* guidelines and whether Theodore Binek has the ability to pay.

[¶ 18] We affirm the trial court's decision enforcing the premarital agreement because it is fair, equitable, reasonable, and just; does not contravene public policy; and was executed fairly. However, because the agreement did not govern the parties' rights to spousal support and the trial court did not sufficiently explain its rationale for denying Ruth Binek spousal support, we reverse and remand for further proceedings in accordance with this opinion.

[¶ 19] CAROL RONNING KAPSNER, MARY MUEHLEN MARING, WILLIAM A. NEUMANN, and DALE V. SANDSTROM, JJ., concur.