Filed 4/30/09 by Clerk of Supreme Court

IN THE SUPREME COURT

STATE OF NORTH DAKOTA

2009 ND 73

Curtis L. Sailer, Plaintiff and Appellee

v.

Sandra K. Sailer, Defendant and Appellant

No. 20080114

Appeal from the District Court of Burleigh County, South Central Judicial District, the Honorable Thomas J. Schneider, Judge.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

Opinion of the Court by Kapsner, Justice.

Gregory I. Runge (argued), 1983 E. Capitol Ave., Bismarck, ND 58501, for plaintiff and appellee.

Kent M. Morrow (argued), Severin, Ringsak & Morrow, 411 N. 4th St., P.O. Box 2155, Bismarck, ND 58502-2155, for defendant and appellant.

Sailer v. Sailer

No. 20080114

Kapsner, Justice.

[¶1] Sandra Sailer appeals from a judgment enforcing a prenuptial agreement and awarding physical custody of the parties’ three minor children to Curtis Sailer.  We affirm in part, reverse in part, and remand for further proceedings.

I

[¶2] Curtis Sailer and Sandra Sailer met in 1989.  They both signed a prenuptial agreement on May 13, 1993.  The parties married on May 29, 1993 and resided near Hazen, North Dakota.  Sandra Sailer had one child prior to their marriage, and the parties had three children during the marriage.

[¶3] In October 2006, Sandra Sailer took the parties’ minor children, left the family home, and relocated to Bismarck, North Dakota.  Curtis Sailer filed for divorce on November 13, 2006, and Sandra Sailer answered.  An interim order hearing was held on December 29, 2006, and on January 9, 2007, the trial court entered an interim order awarding Curtis Sailer temporary legal and physical custody of the parties’ minor children.  Trial was held on December 20-21, 2007.  The district court entered a judgment on March 18, 2008.  The district court deemed the prenuptial agreement conscionable as a matter of law and held the agreement was not so one-sided as to be unenforceable.  The district court found Curtis Sailer did not waive the express provision of the prenuptial agreement by supporting his family with his income.  The district court awarded Curtis Sailer physical custody of the children and both parties legal custody of their children.  Sandra Sailer appeals.

II

[¶4] On appeal, Sandra Sailer asserts the trial court erred by enforcing the prenuptial agreement.  Sandra Sailer asserts the prenuptial agreement should not be enforced because:  she did not voluntarily enter the prenuptial agreement; Curtis Sailer knowingly waived his right to enforce the prenuptial agreement; enforcement of the prenuptial agreement will likely cause her to seek public assistance; and if the prenuptial agreement is enforced, its substantive effect is unconscionable.

A

[¶5] “A premarital agreement becomes effective upon marriage, but several other parts of [The Uniform Premarital Agreement] Act affect the enforceability of a premarital agreement.”  
Estate of Lutz
, 1997 ND 82, ¶ 25, 563 N.W.2d 90 (internal citation omitted).  Section 14-03.1-06(1)(a), N.D.C.C., provides a premarital agreement is not enforceable if the party against whom enforcement is sought proves the prenuptial agreement was not executed voluntarily.

[¶6] The trial court did not make an express finding of fact on whether Sandra Sailer voluntarily entered into the prenuptial agreement.  However, because the trial court enforced the prenuptial agreement, it can be inferred that the trial court concluded both parties voluntarily entered into the prenuptial agreement.  On appeal, Sandra Sailer argues she did not voluntarily enter into the prenuptial agreement and did not know she could seek advice of counsel.

[¶7] At trial, both Curtis Sailer and Sandra Sailer testified as to this matter.  Curtis Sailer testified he hired attorney John Olson to draft the prenuptial agreement.  Curtis Sailer testified on the date the parties signed the prenuptial agreement, May 13, 1993, attorney John Olson was surprised Sandra Sailer did not have legal representation.  Curtis Sailer also testified attorney John Olson:

asked where her attorney or counsel was to represent her and she said she didn’t have any and he said that he cannot represent her:  I am representing Curt, so we can reschedule it so you can find counsel.  And, I mean, if you can find somebody in two or three days to review it and then come back, we would reschedule.

Curtis Sailer testified Sandra Sailer “said she was fine with signing it as is.”  Curtis Sailer testified attorney John Olson reacted by stating:  “Then if you are going to do that, then you have to review the whole prenup agreement, and so he went through step by step and explained everything to both of us and [asked] if she had any questions.”

[¶8] Sandra Sailer testified the first draft of the prenuptial agreement was presented to her about one month before she signed it, and she indicated she had a chance to read it.  When asked if she sought out legal counsel, she testified she did not because she could not afford it.  When asked if either Curtis Sailer or attorney John Olson suggested that she should seek advice of another attorney, she responded:  “I don’t recall.”  On direct examination, Sandra Sailer testified:

Q. . . . Do you recall how long you were in Mr. Olson’s office before the agreement was signed?

A. I would say it was less than a half hour. 

Q. Do you remember what happened during that?

A. Came in, sat down at a table, [attorney John Olson] told me this was a standard prenuptial agreement with various things in here.  He went over property, financial, and focused mostly on the parts that I was aware of, which was the last two pages, Exhibit A.

. . . . 

Q. . . . Did he ever read through, as Curt indicated, each of the paragraphs to make sure that you understood what that paragraph said? 

A. No. 

Q. Did he ask you whether or not you had any questions about what was in the prenuptial agreement?

A. No. All I was made aware of was this was to protect the assets listed on these pages.

Q. Did anyone tell you that it also included protection of any increase in those assets?  If they increased in value over the years of the marriage that that would also be included?

A. No. 

. . . .

Q.        Did you also understand or was it explained to you by Mr. Olson that by signing this you were also giving up any right to claim alimony or spousal support or property in case of a divorce?

A. No. 

Q. Now, did both of you, that being Curt and yourself, sign this agreement at the same time?

A. Yes, we were both there at the same time.  Within moments of each other signed it. 

[¶9] On cross-examination, Sandra Sailer testified: 

Q. Now, you signed this agreement, did you not?

A. Yes, I did.

Q. And you signed it with Curt present?

A. Yes. 

Q. And you signed it in front of Mr. Olson?

A. Yes.

Q. But you can’t recall going through the document with Mr. Olson?

A. The only thing I recall going through is the last two pages. 

Q. Do you have it in front of you?

A. Yes, I do. 

Q. Turn to page four.  Number 12, can you read that out loud please, just the first sentence?

A. The parties recognize and understand that this agreement is being executed 16 days prior to their scheduled wedding date of May 29th, 1993.  

Q. Why did you sign this document?

A. So that he would trust me. 

Q. No other reason than trust?

A. That is correct.  These things on the last two pages were of great importance to him. 

Q. Did you read the document at all?

A. I looked over the first draft.

Q. Was the first draft different to this draft?

A. I can’t recall.

Q. Did you contact either Curtis or Mr. Olson with any changes that you thought would be important to the prenuptial agreement? 

A. I did not know that I would have the right to make changes to my future husband’s prenuptial agreement. 

Q. Say that again? 

A. Did not know I would have the right to make changes to my husband’s — or future husband’s prenuptial agreement. 

Q. You didn’t consult with an attorney?

A. No. 

. . . .

Q. . . . Would you read — or go to page five and read number 13?

A. The parties each acknowledge and represent that this agreement has been executed by each of them free of persuasion, fraud, undue influence, or economic, physical or emotional duress of any kind whatsoever. 

Q. Are you claiming that any of these occurred?

A. Occurred in the document itself?

Q. No, occurred forcing you to sign it?

A. My economic condition was very present in this. 

Q. Certainly it was.  Let’s go to your economic condition.  Let’s go to page one, paragraph one — excuse me, paragraph three.  What does that say?

A. I am sorry, where?

Q. Page one, paragraph three.

A. Wife has not accumulated any significant assets, investments or property and her assets essentially consist of personal property. 

Q. So was recognized, was it not, that you had virtually little bringing into the relationship?

A. Right. 

Q. Again I ask you, why did you sign the document?

A. And again I say, so he would trust me. 

Q. Now on page four, number 12 again?

A. Um-hum.

Q. Would you read that sentence out loud?

A. The parties acknowledge that each has had sufficient opportunity prior to executing this agreement to consult with counsel, to reschedule the wedding date if necessary, and/or not to proceed with the marriage, but each nonetheless agrees that the timing of the execution of this agreement has no effect upon their decision to execute this agreement. 

Q. So I ask you, why did you get married?

A. Because I loved him and I thought he loved me. 

Q. And you signed the agreement?

A. That is correct.

Q. And you didn’t reschedule the wedding date?

A. No. 

Q. And you didn’t consult with counsel?

A. I could not afford counsel.

Q. But you had plenty of time though. Did you go to — 

A. I did not have $200 an hour to pay someone to go over this with me. 

Q. Well, did you go to any of the free clinics in Bismarck?

A. I was not aware of any. 

Q. How about legal assistance?

A. I was not made aware of that either.

Q. Did you call the bar association?

A. No. 

Q. Why not?

A. Didn’t know that’s what you needed to do.  Nobody gave me any instruction. 

Q. Well, this is a contract, right?

A. It’s a prenuptial agreement. 

Q. It’s a contract, right? 

A. Our marriage is a contract. 

Q. What is this prenuptial agreement then?

A. A piece of paper.

Q. It doesn’t mean anything to you then?

A. It’s not a vow before God. 

Q. Does this mean anything to you, this contract? 

A. Not since it stated in here that if he died I would have absolutely nothing. 

Q. Does this mean anything to you or not?

A. No. 

Q. It doesn’t mean anything? As far as you are concerned — 

 A. The last two pages are the only thing that mean anything. 

Q. Just stop.  Let me ask the question.  So as far as you are concerned, this is nothing more than ink on paper?

A. That is correct.

[¶10] This Court has held:  “Lack of legal advice to a prospective spouse to obtain independent counsel is a significant factor in weighing the voluntariness of a premarital arrangement, but the presence of independent counsel is not a prerequisite to enforceability.”  
Estate of Lutz
, 2000 ND 226, ¶ 17, 620 N.W.2d 589 (citing 
Estate of Lutz
, 1997 ND 82, ¶¶ 31, 34, 563 N.W.2d 90).  Curtis Sailer testified attorney John Olson gave Sandra Sailer an opportunity to obtain independent legal counsel, and when Sandra Sailer was asked if attorney John Olson advised her to obtain legal counsel, she responded:  “I don’t recall.”

[¶11] Neither party called attorney John Olson to testify at trial.  On appeal, Sandra Sailer contends it is “significant and telling” that Curtis Sailer did not call attorney John Olson to testify to shed an objective light on the issue, and Curtis Sailer did not produce documentation suggesting attorney John Olson explained his role to Sandra Sailer.  As the party opposing enforcement, Sandra Sailer had the burden to prove the prenuptial agreement was not executed voluntarily.  N.D.C.C. § 14-03.1-06(1)(a).  Her testimony establishes she had the document and had an opportunity to examine its contents well in advance of its execution.  Sandra Sailer testified she was aware of the disparity in the parties’ resources at the time of execution, and the document reflects the same.  Nothing establishes any undue pressure to sign the document other than her desire to marry and to have Curtis Sailer “trust” her.  Therefore, we hold the record does not establish Sandra Sailer met her burden of showing she did not voluntarily enter into the prenuptial agreement.

B

[¶12] Paragraph seven of the prenuptial agreement provides:  “The parties agree that all of the earnings and accumulations resulting from either spouse’s personal services, skills, efforts and work, together with all property acquired or income derived therefrom, shall be the separate property of the party to whom the earnings and income are attributable.”  The trial court held:  “Throughout the marriage, Curtis never waived the express provisions of the agreement by voluntarily using his separate income to provide to Sandra and the children.”  On appeal, Sandra Sailer argues Curtis Sailer knowingly waived his right to enforce the provisions of the prenuptial agreement.  Sandra Sailer is essentially arguing that because Curtis Sailer routinely used his money to support both Sandra Sailer and her daughter, this was a knowing and voluntary waiver of paragraph seven of the prenuptial agreement, and it constituted a waiver of the enforceability of the entire prenuptial agreement.

[¶13] At trial, Sandra Sailer testified the parties never held joint bank accounts.  She also testified Curtis Sailer took care of all of the bills associated with their house and married life.  Paragraph seven of the prenuptial agreement simply states the parties’ earnings and property were to be kept separate; it does not indicate the parties could not provide for one another.  Therefore, Sandra Sailer’s testimony suggests the parties complied with paragraph seven of the prenuptial agreement.  We hold Curtis Sailer did not waive or violate paragraph seven of the prenuptial agreement by supporting his family.  Such support, therefore, cannot establish a waiver of the enforcement of the entire agreement.

[¶14] Section 14-07-03, N.D.C.C., provides:  “The husband and wife have a mutual duty to support each other out of their individual property and labor.”  By supporting Sandra Sailer throughout their marriage, Curtis Sailer complied with N.D.C.C. § 14-

07-03.  Compliance with this statutory mandate does not establish a waiver of the provisions of paragraph seven of the prenuptial agreement.

[¶15] Sandra Sailer contends because Curtis Sailer violated paragraph seven of the prenuptial agreement, the entire prenuptial agreement is unenforceable.  However, Sandra Sailer did not point to any authority suggesting if one clause of a contract or prenuptial agreement is violated or waived, the entire contract or prenuptial agreement is unenforceable.  We affirm the trial court’s finding that Curtis Sailer did not waive or violate paragraph seven of the prenuptial agreement.  However, even if we were to hold to the contrary, paragraph fifteen of the prenuptial agreement provides:  “Should any provision of this agreement be held invalid or unenforceable by any court of competent jurisdiction, all other provisions shall nonetheless continue in full force and effect, to the extent that the remaining provisions are fair, just and equitable.”  Therefore, even if we would have determined Curtis Sailer waived paragraph seven of the prenuptial agreement, this would not render the entire prenuptial agreement unenforceable.

C

[¶16] The trial court found:  “Sandra has demonstrated that she can be self-

sufficient.  Under the prenuptial agreement, if the marriage was terminated, both [Curtis Sailer and Sandra Sailer] agreed not to make any claims for support or alimony.  Therefore, neither Curtis nor Sandra is granted spousal support or alimony.”  On appeal, Sandra Sailer asserts because enforcement of the prenuptial agreement would likely cause her to seek public assistance, she is entitled to spousal support.  Section 14-03.1-06(2), N.D.C.C., provides:

If a provision of a premarital agreement modifies or eliminates spousal support and that modification or elimination causes one party to the agreement to be eligible for support under a program of public assistance at the time of separation or marital dissolution, a court, notwithstanding the terms of the agreement, may require the other party to provide support to the extent necessary to avoid that eligibility.

[¶17] On November 8, 2006, Sandra Sailer signed a financial statement and affidavit which was subsequently filed with the trial court on December 8, 2006.  In the affidavit, Sandra Sailer indicated she received TANF (Temporary Assistance for Needy Families) and WIC (North Dakota Women, Infants, and Children Program).  At the time Sandra Sailer signed and filed the financial statement and affidavit, she had the parties’ three minor children living with her.  The trial court entered an interim order on January 9, 2007, awarding Curtis Sailer custody of the parties’ minor children.

[¶18] At trial, on redirect examination, Sandra Sailer testified:  

Q. . . . During the time that you have been separated from Curt, have you ever sought any public assistance?

A. Yes. 

Q. What did you receive?

A. I received food stamps, TANF, the jobs program with Job Service, child care assistance while I was job seeking.

Q. Do you still receive any?

A. No, I receive nothing. 

Q. Any reason why?

A. I don’t qualify.

Q. Why don’t you qualify?

A. I make too much money. 

Q. During the time that you were married to Curt and living in the same household, did you ever attempt to qualify on public assistance?

A. No. 

Q. But you had prior to the marriage?

A. Correct.  

[¶19] On recross-examination, Sandra Sailer testified: 

Q. You are not on TANF?

A. No, I’m not.

Q. Why not?

A. I don’t qualify.

Q. Why don’t you qualify?

A. I have a job now. 

Q. And TANF is actually for your children as well, is it not?

A. It is for children and parents and TANFs jobs program, which is what I was on that helped you find jobs. I did a program through Job Service. 

. . . .

Q. You are not on any state aid right now?

A. No, I am not. 

Q. Because you are working and don’t qualify?

A. That is correct.

[¶20] Sandra Sailer’s financial affidavit and testimony both indicate she received public assistance after she and Curtis Sailer separated.  However, she testified she did not qualify for public assistance at the time of trial, nor has she provided any evidence that she is likely to qualify for such assistance after trial.  She has failed to establish that enforcement of the agreement will cause her to be eligible for public assistance.  On this record, we hold N.D.C.C. § 14-03.1-06(2), does not preclude enforcement of the prenuptial agreement.

D

[¶21] On appeal, Sandra Sailer asserts the prenuptial agreement is so one-sided that enforcement of the prenuptial agreement would be unconscionable.  The trial court held, “the prenuptial agreement, dated May 13, 1993, between the parties is conscionable as a matter of law.”  Section 14-03.1-06(3), N.D.C.C., provides:  “An issue of unconscionability of a premarital agreement is for decision by the court as a matter of law.”  “Unconscionability of a premarital agreement is a matter of law, but it turns on factual findings related to the relative property values, the parties’ financial circumstances, and their ongoing need.”  
Binek v. Binek
, 2004 ND 5, ¶ 10, 673 N.W.2d 594 (citing 
Estate of Lutz
, 1997 ND 82, ¶ 44, 563 N.W.2d 90).  The substantive enforceability of a premarital agreement is a matter of law to be decided by the court.  
Peters-Riemers v. Riemers
, 2002 ND 72, ¶ 20, 644 N.W.2d 197 (citing 
Estate of Lutz
, 1997 ND 82, ¶ 39, 563 N.W.2d 90).

[¶22] The Uniform Premarital Agreement Act provides premarital agreements may be deemed unenforceable if unconscionable at the time of execution, at the time of separation or marital dissolution, or at the time of enforcement.  N.D.C.C. § 14-03.1-

06(1)(b); N.D.C.C. § 14-03.1-06(2); N.D.C.C. § 14-03.1-07; 
Estate of Lutz
, 2000 ND 226, ¶ 25, 620 N.W.2d 589.  Sandra Sailer asserts the prenuptial agreement should not be enforced because it was unconscionable at the time of enforcement.  She asserts substantive enforceability rests on issues of “harshness and one-

sidedness.”

[¶23] The Uniform Premarital Agreement Act allows prospective spouses to contract with respect to, among other things:  “The rights and obligations of each of the parties in any of the property of either or both of them whenever and wherever acquired or located[;] . . . [t]he disposition of property upon . . . marital dissolution . . . [; and]  [t]he modification or elimination of spousal support.”  N.D.C.C. § 14-03.1-03(1)(a), (c), (d).

[¶24] In their prenuptial agreement, the parties contracted with respect to their property.  Paragraph two provided:  “The parties are each fully informed concerning all of the property and assets of the other and desire that their marriage shall not in any way change the husband’s separate legal rights as relates to all of the assets, investments and property he presently has and will continue to accumulate.  A full list of husband’s assets, investments and property is attached[.]”  Paragraph three stated:  “Wife has not accumulated any significant assets, investments or property and her assets essentially consist of personal property.”  Paragraph four provided, in part:

Husband shall have full right to own, use, control, encumber and dispose of all of his property as it now exists, as it shall change, increase or decrease from time to time the same as if the marriage relationship did not exist. . . . The wife may also continue to hold in her separate name, and in the future acquire in her separate name, other properties and investments which shall remain in her separate property.  The parties anticipate that during their marriage, they will acquire property and investments which they agree are to be considered to be owned jointly by them and, accordingly, they expressly agree that all such property and investments which are registered in their joint names, shall, for all purposes, be considered to be owned one-half by each of them.  All household goods and furnishings acquired by the parties during the period of their marriage, including replacements of existing items, shall be considered to be owned jointly between them.

Paragraph seven provided:  “The parties agree that all of the earnings and accumulations resulting from either spouse’s personal services, skills, efforts and work, together with all property acquired or income derived therefrom, shall be the separate property of the party to whom the earnings and income are attributable.”  Paragraph ten stated: 

Notwithstanding any provision in this agreement to the contrary, any and all property and/or assets acquired before or during the marriage by either party by way of gift or inheritance from a third party shall be deemed the separate property of the party so acquiring including, but not limited to, any income thereon, increments, accretions, or increases in value of such assets at any time, whether due to market conditions or the services, skills or efforts of either party. 

The parties contracted with respect to spousal support and claims against each other’s property in paragraph six of the prenuptial agreement:  

The parties agree that whether the marriage is terminated by death or legal proceedings, they will make no claim except as otherwise specifically provided in this agreement, on any part of the property of the other and waive all rights of power [sic], curtesy, community property, homestead, inheritance, succession, surviving spouse or family allowance, exempt property, claims for support, alimony, attorney’s fees and costs of property settlement.

[¶25] This Court has held:  “Even if a premarital agreement has been validly and voluntarily obtained, its substantive effect may be unconscionable and thus unenforceable.”  
Estate of Lutz
, 1997 ND 82, ¶ 39, 563 N.W.2d 90. Section 14-03.1-

07, N.D.C.C., provides:

Notwithstanding the other provisions of this chapter, if a court finds that the enforcement of a premarital agreement would be clearly unconscionable, the court may refuse to enforce the agreement, enforce the remainder of the agreement without the unconscionable provisions, or limit the application of an unconscionable provision to avoid an unconscionable result. 

[¶26] In enacting N.D.C.C. ch. 14-03.1,  the Legislature adopted the Uniform Premarital Agreement Act.  1985 N.D. Sess. Laws ch. 190, §§ 1-9.  However, N.D.C.C. § 14-03.1-07 is not part of the Uniform Premarital Agreement Act; rather, it is a separate provision enacted by the Legislature.  
Hearing on S.B. 2174 Before the Senate Judiciary Comm.
, 49th N.D. Legis. Sess. (Jan. 23, 1985); Unif. Premarital Agreement Act, 9C U.L.A. 38 (2001).  We have interpreted N.D.C.C. § 14-03.1-07 and have set forth guidelines for trial courts to use when analyzing this statute.  We have held when trial courts discuss whether a premarital agreement is “clearly unconscionable” under N.D.C.C. § 14-03.1-07, the analysis requires complete factual findings about the relative property values and the other resources and foreseeable needs of the spouse asserting the premarital agreement is unconscionable.”  
Estate of Lutz
, 1997 ND 82, ¶ 45, 563 N.W.2d 90.

[¶27] In the trial court’s Findings of Fact, Conclusions of Law, and Order for Judgment, the trial court noted Sandra Sailer’s net monthly income from all sources was $860.05.  It also indicated Sandra Sailer has demonstrated she can be self-

sufficient.  The parties filed a Rule 8.3 Property and Debt Listing.  The trial court noted:  “Plaintiff and defendant should pay all of the debts they are individually responsible for as listed on the Rule 8.3 Property and Debt Listing.”  Both parties valued their assets on the Rule 8.3 Property and Debt Listing; however, nothing in the record indicates the trial court placed a value on the assets.

[¶28] Although the trial court found the prenuptial agreement to be conscionable as a matter of law, it did not make findings necessary to come to this conclusion.  We conclude the trial court did not provide sufficient findings to allow this Court the opportunity to properly review its decision under N.D.C.C. § 14-03.1-07.  
See
 
Ebach v. Ebach
, 2008 ND 187, ¶ 16, 757 N.W.2d 34.  When a trial court does not make required findings, it errs as a matter of law, and it is necessary to remand for additional findings.  
Id.
 at ¶ 14 (citation omitted).  We remand this issue to the trial court with instructions to value the parties’ assets, make findings as to their other resources, and determine their foreseeable needs for purposes of deciding whether enforcement of the agreement is unconscionable.  We are not concluding the prenuptial agreement was unconscionable as a matter of law; we only hold the trial court was required to make specific findings, and it did not.

III

[¶29] On appeal, Sandra Sailer asserts the trial court failed to make an equitable division of the marital estate.  A trial court’s determinations regarding the division of marital property are treated as findings of fact and may be reversed on appeal if these findings are clearly erroneous.  
Lynnes v. Lynnes
, 2008 ND 71, ¶ 12, 747 N.W.2d 93 (citing 
Heinz v. Heinz
, 2001 ND 147, ¶ 6, 632 N.W.2d 443).

[¶30] Paragraph four of the prenuptial agreement provides in part: 

The parties anticipate that during their marriage, they will acquire property and investments which they agree are to be considered to be owned jointly by them and, accordingly, they expressly agree that all such property and investments which are registered in their joint names, shall, for all purposes, be considered to be owned one-half by each of them.  All household goods and furnishings acquired by the parties during the period of their marriage, including replacements of existing items, shall be considered to be owned jointly between them.

Thus, the parties’ property and investments “registered in their joint names” and their household goods and furnishings are subject to the prenuptial agreement and are presumed to be owned one-half by each of them.

[¶31] The trial court judgment did not mention what property is registered in joint names nor the existence of household goods which are to be considered jointly owned.  The record indicates the parties jointly own a 2004 Chevrolet Suburban.  The record suggests the parties have household goods other than what appears on Exhibit A to the prenuptial agreement.  The trial court failed to equitably divide such jointly owned property, even though such property should have been divided in accordance with the prenuptial agreement.

[¶32] A trial court is required to determine the total value of the marital estate in order to make an equitable division of property.  
Hitz v. Hitz
, 2008 ND 58, ¶ 11, 746 N.W.2d 732 (citing 
Ulsaker v. White
, 2006 ND 133, ¶ 13, 717 N.W.2d 567).  “After a fair evaluation of the property is made, the entire marital estate must then be equitably divided between the parties under the 
Ruff
-
Fischer
 guidelines.”  
Ulsaker
, 2006 ND 133, ¶ 13, 717 N.W.2d 567 (citing 
Neidviecky v. Neidviecky
, 2003 ND 29, ¶ 10, 657 N.W.2d 255); 
see
 
Fischer v. Fischer
, 139 N.W.2d 845, 852 (N.D. 1966); 
Ruff v. Ruff
, 78 N.D. 775, 784, 52 N.W.2d 107, 111 (1952).  “[P]arties are entitled to a division of their property under a correct application of the law by the trial court.”  
Jangula v. Jangula
, 2005 ND 203, ¶ 16, 706 N.W.2d 85 (quoting 
Brandner v. Brandner
, 2005 ND 111, ¶ 11, 698 N.W.2d 259).  The trial court did not make any findings as to the value of the marital estate, and it did not distribute all of the marital property.  We reverse and remand the issue of the parties’ property to the trial court, with instructions to determine an equitable distribution of the parties’ jointly held property.

IV

[¶33] On appeal, Sandra Sailer contends the trial court erred by awarding primary custody of the parties’ minor children to Curtis Sailer.  Our standard of review of a trial court’s child custody decision is clear:

We exercise a limited review of child custody awards.  A district court’s decisions on child custody, including an initial award of custody, are treated as findings of fact and will not be set aside on appeal unless clearly erroneous.  A finding of fact is clearly erroneous if it is induced by an erroneous view of the law, if no evidence exists to support it, or if the reviewing court, on the entire evidence, is left with a definite and firm conviction a mistake has been made.  Under the clearly erroneous standard of review, we do not reweigh the evidence or reassess the credibility of witnesses, and we will not retry a custody case or substitute our judgment for a district court’s initial custody decision merely because we might have reached a different result.  A choice between two permissible views of the weight of the evidence is not clearly erroneous, and our deferential review is especially applicable for a difficult child custody decision involving two fit parents.

Koble v. Koble
, 2008 ND 11, ¶ 6, 743 N.W.2d 797 (quoting 
Jelsing v. Peterson
, 2007 ND 41, ¶ 11, 729 N.W.2d 157).   On appeal, the complaining party bears the burden of demonstrating that a finding of fact is clearly erroneous.  
Reeves v. Chepulis
, 1999 ND 63, ¶ 8, 591 N.W.2d 791 (citation omitted).

[¶34] On appeal, Sandra Sailer contends the trial court improperly ceded its decision making authority to the custody investigator by adopting the analysis and conclusions of the custody investigator’s report.  This Court has held:  “Generally, a ‘court cannot make the report of an independent investigator the conclusive basis of its decision regarding the custody of the children.  The reason for this rule is usually expressed by the phrase that the trial court cannot delegate to anyone the power to decide questions of child custody.’”  
Owan v. Owan
, 541 N.W.2d 719, 722 (N.D. 1996) (citations omitted).  This Court has also noted it is not the best judicial practice for a trial court to adopt a child custody investigator’s report; rather, it would be better for the trial court to take the report into consideration and come to its own conclusions.  
Hanson v. Hanson
, 2005 ND 82, ¶ 11, 695 N.W.2d 205.

[¶35] In coming to its decision regarding child custody, the trial court held:  “The Court has reviewed all of the ‘best interests’ factors in Section 14-09-06.2, N.D. Cent. Code, as well as the custody investigation report and update of [the custody investigator’s] analysis and conclusions[.]”  The trial court not only reviewed the custody investigator’s report, but also observed the custody investigator testify at trial.  This Court has held:  “[A] district court’s opportunity to observe witnesses and determine their credibility should be given great deference.”  
Hanson
, 2005 ND 82, ¶ 11, 695 N.W.2d 205 (citing 
Hanson v. Hanson
, 2003 ND 20, ¶ 11, 656 N.W.2d 656).  The fact that the trial court agreed with the custody investigator’s analysis and conclusions is not in itself clearly erroneous.

[¶36] When a trial court makes a decision as to child custody, it must strive to serve the children’s best interests.  
DesLauriers v. DesLauriers
, 2002 ND 66, ¶ 5, 642 N.W.2d 892 (citing 
Schmaltz v. Schmaltz
, 1998 ND 212, ¶ 6, 586 N.W.2d 852).  The trial court must consider several factors as it forms its custody decision, as outlined in N.D.C.C. § 14-09-06.2(1).  
Id.
  In the present case, the trial court indicated it reviewed all of the best interests factors in N.D.C.C. § 14-09-06.2, and it concluded best interests factors a, b, c, d, h, and j favored Curtis Sailer.  On appeal, Sandra Sailer asserts some of these factors do not necessarily favor one party over the other party, and she contends other factors favor Sandra Sailer.

A

[¶37] Factor a is “[t]he love, affection, and other emotional ties existing between the parents and child.”  N.D.C.C. § 14-09-06.2(1)(a).  The trial court favored Curtis Sailer on this factor.  The custody investigation report provides:

There have been some disagreements and frustrations expressed by Sandi toward Curt during the exchanges and while the children are present. [One of the children] has recently expressed concern that Sandi was going to take him and not return him to his Dad’s after the weekend.

There have been weekends that are Sandi’s scheduled weekend, and she calls Curt to come and get them early or to take them to the doctor.

When asked why she favored Curtis Sailer on factor a, the custody investigator testified: 

I guess I base that on the times since they went back to Curt in — I don’t remember when that was.  When they went back though.  The context that Sandy has been with the children, there were a lot of times where she called and had Curt come and pick them up early.  They were missed.  I don’t know if there were missed times, but there were — the early times saying she couldn’t handle them.  And just [the parties’ oldest child], the feel I got from [him] was that he kind of felt left out when he was with his mom.

[¶38] On appeal, Sandra Sailer asserts factor a should be equal.  She argues the custody investigator only discussed her relationship with the children from December 2006 to the present.  She also contends the custody investigator improperly weighed the fact that Curtis Sailer would take their children to the doctor at Sandra Sailer’s request.

[¶39] The custody investigator’s report indicates evidence existed supporting the determination that Curtis Sailer is favored on factor a.  The trial court reviewed the custody investigator’s report, listened to her testimony, and agreed.  Therefore, the trial court’s finding that factor a favored Curtis Sailer was not clearly erroneous.

B

[¶40] Factor b is “[t]he capacity and disposition of the parents to give the child love, affection, and guidance and to continue the education of the child.”  N.D.C.C. § 14-

09-06.2(1)(b).  The trial court favored Curtis Sailer on factor b.  The custody investigator’s report indicates the parties’ oldest child’s academic performance was stronger when he lived with Curtis Sailer, compared to when he lived with Sandra Sailer.  At trial, the custody investigator testified Curtis Sailer is “stronger” than Sandra Sailer in the area of continuing the education of the children.  When asked to explain, the custody investigator testified:

Just this whole year [Sandra Sailer has not had] contact with the school. . . . [When the parties’ oldest child] was in school those two months, the teacher didn’t have any contact with her other than she would see her picking them up, but really didn’t have much contact.  I think that’s crucial if you are going to continue education, you need to have contact with the education system and I don’t think she had that.

[¶41] On appeal, Sandra Sailer asserts this factor should be equal.  She contends the evidence does not support the custody investigator’s finding on this factor, and both parents have the ability to provide for their children.  The custody investigator’s report and testimony indicate there is evidence supporting the conclusion that Curtis Sailer is favored on factor b.  The trial court’s conclusion that factor b favored Curtis Sailer was not clearly erroneous.

C

[¶42] Factor c is “[t]he disposition of the parents to provide the child with food, clothing, medical care, or other remedial care recognized and permitted under the laws of this state in lieu of medical care, and other material needs.”  The trial court favored Curtis Sailer on factor c.  The custody investigator’s report indicated because Curtis Sailer has the children more often, he provides the majority of their needs.  It also stated when the children get sick when they are with Sandra Sailer, she has called Curtis Sailer to take them to the doctor or get them medicine.  The report also indicated while the parties are supposed to be splitting the medical costs not covered by insurance, Curtis Sailer pays for all of the children’s medical expenses.

[¶43] On appeal, Sandra Sailer asserts this factor should be equal.  She contends: “The sole reason for favoring Curtis on this factor seems to be the amount of time spent with the children being equaled to the amount of money spent on the children.”  However, the custody investigator testified her finding was not significantly based on the fact that Curtis Sailer has a greater income.  Both the custody investigation report and the custody investigator’s testimony indicate there was a factual basis for determining factor c favored Curtis Sailer.  The trial court’s holding that factor c favored Curtis Sailer was not clearly erroneous.

D

[¶44] Factor d is “[t]he length of time the child has lived in a stable satisfactory environment and the desirability of maintaining continuity.”  The trial court favored Curtis Sailer on factor d.  The custody investigator’s report provides:  “Sandi has been in her apartment since the end of October, and has no plans of moving.  It is a three bedroom apartment, so [the parties’ oldest child] gets his own room.  [The other two children] share a room, and Sandi has a room.”  It also states:

Curt’s home is a four bedroom two bathroom home about one mile from Hazen.  It includes a large den, game room and play area downstairs.  Outdoors for the children are swings, slide, climbing wall and a sand box.  There is also a paved driveway for them to ride bike, and a patio in the backyard.  The play area is fenced in and protected.  

At trial, the custody investigator was questioned about factor d: 

Q. And factor D, did you also consider the difference between their two residences, is that a major factor.  I mean, the size?

A. Not necessarily.  It’s a factor, but it’s not a major factor. 

Q. Why was it a factor? 

A. I think the stability, regardless of which home, it’s the stability rather than location.

Q. And would you agree with me that children can gain stability over a period of time if they’re moved?  Families move all the time. 

A. Sure. 

Q. Stability is something that is gained progressively?

A. Yes, I agree. 

Q. If it’s not instant stability, you move to some other residence?

A. Right. 

[¶45] On appeal, Sandra Sailer asserts she should be favored on this factor.  She contends the custody investigator equated the parties’ financial and economic situations with providing a stable environment.  Sandra Sailer also argues at trial, the custody investigator gave greater weight to Curtis Sailer because he lived in a house rather than an apartment.  However, according to the above-quoted testimony, at trial, the custody investigator indicated the size of the parties’ homes is a factor, but not a major factor.

[¶46] In discussing factor d, this Court has explained: 

Essentially, factor d addresses past stability of environment, including a consideration of place or physical setting, as well as a consideration of the prior family unit and its lifestyle as part of that setting.  It also addresses the quality of that past environment, and the desirability of maintaining continuity.  Under factor d, prior custody is a factor to be considered when determining the custodial arrangement which is best for the child.

Shaw v. Shaw
, 2002 ND 114, ¶ 7, 646 N.W.2d 693 (quoting 
Stoppler v. Stoppler
, 2001 ND 148, ¶ 9, 633 N.W.2d 142).  In applying factor d, a trial court should analyze more than a physical structure or a geographic location; however, a trial court’s concerns about allowing children to attend the same school and live in the same house are valid considerations under factor d.  
Burns v. Burns
, 2007 ND 134, ¶ 17, 737 N.W.2d 243 (citations omitted).  In the present case, it appears the trial court may have inadequately analyzed factor d; however, the weight of the other best interests factors favor Curtis Sailer.

E

[¶47] Factor h is “[t]he home, school, and community record of the child.”  N.D.C.C. § 14-09-06.2(1)(h).  The trial court favored Curtis Sailer on this factor.  The custody investigator’s report indicates the parties’ oldest child makes greater academic progress when he lives with Curtis Sailer.  When questioned about factor h at trial, the custody investigator was asked when she was considering Sandra Sailer’s parenting performance in the past, if she took into account the fact that Sandra Sailer had twins.  The custody investigator replied that she took into consideration the fact that twins increase the workload and can be difficult.

[¶48] On appeal, Sandra Sailer asserts this factor is equal.  There is evidence supporting the trial court’s determination that factor h favored Curtis Sailer; therefore, the trial court’s finding on factor h was not clearly erroneous.

F

[¶49] Factor j pertains to domestic violence, and provides in part:  

Evidence of domestic violence.  In awarding custody or granting rights of visitation, the court shall consider evidence of domestic violence.  If the court finds credible evidence that domestic violence has occurred, and there exists one incident of domestic violence which resulted in serious bodily injury or involved the use of a dangerous weapon or there exists a pattern of domestic violence within a reasonable time proximate to the proceeding, this combination creates a rebuttable presumption that a parent who has perpetrated domestic violence may not be awarded sole or joint custody of a child. . . . As used in this subdivision, “domestic violence” means domestic violence as defined in section 14-07.1-01. 

N.D.C.C. § 14-09-06.2(1)(j).  Domestic violence includes:  “physical harm, bodily injury, sexual activity compelled by physical force, assault, or the infliction of fear of imminent physical harm, bodily injury, sexual activity compelled by physical force, or assault, not committed in self-defense, on the complaining family or household members.”  N.D.C.C. § 14-07.1-01(2). 

[¶50] The custody investigator’s report indicates both parties alleged incidents had occurred pertaining to potential acts of domestic violence, and it states Curtis Sailer was favored on this factor.  At trial, the custody investigator testified none of the incidents she considered in her report fit the definition of domestic violence.  The trial court favored Curtis Sailer on this factor.  On appeal, Sandra Sailer asserts the favoring of Curtis Sailer on this factor is “puzzling and disturbing” because the custody investigator acknowledged none of the incidents rose to the level of domestic violence, yet the custody investigator still favored Curtis Sailer on this factor.

[¶51] The presumption, as set forth in N.D.C.C. § 14-09-06.2(1)(j), is only triggered when the trial court finds “credible evidence that domestic violence has occurred, and there exists one incident of domestic violence which resulted in serious bodily injury or involved the use of a dangerous weapon or there exists a pattern of domestic violence within a reasonable time proximate to the proceeding.”  
Reeves v. Chepulis
, 1999 ND 63, ¶ 11, 591 N.W.2d 791 (citations omitted).  If the presumption is not triggered, the trial court is not required to make specific factual findings; however, such evidence can still be considered by the trial court as one of the best interests factors.  
Gietzen v. Gabel
, 2006 ND 153, ¶ 9, 718 N.W.2d 552 (citing 
Cox v. Cox
, 2000 ND 144, ¶ 17, 613 N.W.2d 516).

[¶52] The custody investigator testified none of the incidents rose to the level of domestic violence, and we can infer the trial court agreed, because it held:  “The Court has reviewed . . . the custody investigation report and update of [the custody investigator].  The Court agrees with [the custody investigator’s] analysis and conclusions[.]”  The trial court’s determination that none of the incidents rose to the level of domestic violence sufficient to activate the presumption against custody for the perpetrator is not clearly erroneous.  Further, we hold the trial court’s decision to consider the evidence of the incidents as one of the best interests factors and its decision to favor Curtis Sailer on this factor, is not clearly erroneous.

V

[¶53] We conclude the parties voluntarily entered into the prenuptial agreement, Curtis Sailer did not waive or violate paragraph seven of the prenuptial agreement, and N.D.C.C. § 14-03.1-06(2), does not preclude enforcement of the prenuptial agreement.  We remand the issue of whether the prenuptial agreement is unconscionable as enforced to the trial court with instructions to value the parties’ assets, make findings as to their other resources, and determine their foreseeable needs, in order to determine whether the agreement is unconscionable as enforced.  We further direct the district court to make an equitable distribution of the jointly held property.  We conclude the trial court’s decision to award physical custody of the parties’ minor children to Curtis Sailer is not clearly erroneous.  We affirm in part, reverse in part, and remand for further proceedings.

[¶54] Carol Ronning Kapsner

Dale V. Sandstrom

Daniel J. Crothers

Gerald W. VandeWalle, C.J.

Maring, Justice, dissenting.

[¶55] I agree with parts IIB and III of the majority opinion, but I respectfully dissent from parts IIA, C, and D, and IV.  I would reverse the district court’s order.

I

Voluntariness

[¶56] The Majority, at ¶ 6, acknowledged that “[t]he trial court did not make an express finding of fact on whether Sandra Sailer voluntarily entered into the prenuptial agreement.  However, because the trial court enforced the prenuptial agreement, it can be inferred that the trial court concluded both parties voluntarily entered into the prenuptial agreement.”   I am of the opinion that this Court should not be inferring whether the district court reached a legal conclusion on this issue and respectfully dissent from Part IIA of the majority opinion.

[¶57] The district court’s decision does not reflect that it considered Sandra Sailer’s claim that she did not voluntarily enter into the premarital agreement.  Whether Sandra Sailer received adequate legal advice before signing the premarital agreement is a question of fact that is a significant factor when weighing the voluntariness of a premarital agreement.  
See
 
Estate of Lutz
, 1997 ND 82, ¶ 34, 563 N.W.2d 90.  Sandra Sailer was not represented by an attorney before or at the time of the signing of the premarital agreement.  Curtis Sailer hired attorney John Olson and paid for his services.  Sandra Sailer was on public assistance at the time and testified she could not afford an attorney.  The premarital agreement at paragraph 12 (there are 23 paragraphs) states:  “The parties acknowledge that each has had sufficient opportunity prior to executing this agreement to consult with counsel . . . .”  There is no explicit waiver of counsel in the agreement.  Sandra Sailer testified she did not see the final version until the day she signed it.  Because the district court judgment does not reflect whether it considered Sandra Sailer’s argument, made the necessary factual findings, or concluded that she voluntarily entered into the premarital agreement, we are unable to adequately review this issue on appeal.  
See
 N.D.R.Civ.P. 52(a).  Without the requisite factual findings, we are unable to determine whether the factual findings on voluntariness are clearly erroneous.  Furthermore, without any indication the court considered and disagreed with Sandra Sailer’s claim, we are unable to determine whether the district court correctly concluded she voluntarily entered into the agreement.  Because the district court did not make any factual findings, nor explain its decision on Sandra Sailer’s claim, it erred as a matter of law.  
See
 
Ebach v. Ebach
, 2008 ND 187, ¶ 14, 757 N.W.2d 34.  The case should be remanded for the district court to make factual findings as to whether Sandra Sailer received adequate legal advice before signing the premarital agreement and decide the issue of whether Sandra Sailer voluntarily entered into the premarital agreement.

II

Public Assistance

[¶58] I also dissent from Part IIC of the majority opinion.  On appeal, Sandra Sailer argues she is entitled to spousal support because enforcement of the premarital agreement will likely cause her to seek public assistance.  The Majority, at ¶ 20, concluded N.D.C.C. § 14-03.1-06(2) does not preclude enforcement of the premarital agreement.  Section 14-03.1-06(2), N.D.C.C., provides:

If a provision of a premarital agreement modifies or eliminates spousal support and that modification or elimination causes one party to the agreement to be eligible for support under a program of public assistance at the time of separation or marital dissolution, a court, notwithstanding the terms of the agreement, may require the other party to provide support to the extent necessary to avoid that eligibility.

[¶59] The Majority, at ¶ 20, acknowledged that Sandra Sailer received public assistance after the parties separated, but contends N.D.C.C. § 14-03.1-06(2) does not preclude enforcement of the premarital agreement because she did not receive public assistance at the time of trial.  The Majority misinterprets the law.  Section 14-

03.1-06(2), N.D.C.C., does not require that an individual be eligible to receive public assistance at the time of trial.  Rather, N.D.C.C. § 14-03.1-06(2) expressly provides that a party must be eligible for support “at the time of separation 
or
 marital dissolution.” (Emphasis added.)  After the parties separated and at the time the court issued its interim order, Sandra Sailer was eligible for public assistance.  The district court should have considered whether to award Sandra Sailer spousal support in order to avoid public assistance and made the requisite findings to support its decision.

[¶60] The Majority contends Sandra Sailer has not “provided any evidence that she is likely to qualify for such assistance after trial.”  Majority, at ¶ 20.  Again, N.D.C.C. § 14-03.1-06(2) does not require such a showing.  However, Sandra Sailer argued that she will likely seek public assistance after the trial.  In her trial brief, Sandra Sailer asserted, “[She] has sought, and will likely seek, public assistance in the future.  She is struggling financially at this time.  Section 14-03.1-06(2) may require Curt to provide sufficient support to ‘the extent necessary to avoid that eligibility.’” In her post-trial brief, she argued, 
“If the Court enforces the agreement, Sandra will be left with little or nothing and will likely be forced to seek public assistance of some sort.” 

[¶61] Furthermore, testimony at trial established Sandra Sailer was indeed struggling financially.  She testified that she had three part-time jobs, had taken tests and met with employees at Job Service to acquire better jobs, but only qualified for part-time jobs.  Sandra Sailer also testified that she owed a significant amount of money on credit cards because Curtis Sailer would not provide her money during the marriage and she did not have a job immediately after the parties separated.  Sandra Sailer testified one of her credit cards had a balance of over $17,000 because “[i]t is expensive to live when you don’t have any money,” and she did not have a job for the first two months after the parties separated.  And yet, the only finding the court made concerning Sandra Sailer’s need to be on public assistance was that,
 “Sandra has demonstrated that she can be self-sufficient.”  The evidence in the record does not support the district court’s finding.  The evidence presented establishes that, even if Sandra Sailer continues to work all three jobs, she only earns approximately $774.21 a month or $9,290.52 net annually, making her claims that she will likely need public assistance valid.  After paying $232.00 a month child support, she has a net annual income of $6,506.52.  The federal poverty guideline for 2008 for one person was $10,400 annually.  Federal Register January 23, 2008 (Volume 73, Number 15).  Because there is no indication that the district court considered whether Sandra Sailer was entitled to spousal support to avoid public assistance under N.D.C.C. § 14-03.1-06(2) and the district court failed to make the necessary findings, I would reverse on this issue.

III

Unconscionability

[¶62] I agree with the Majority that the district court’s factual findings on the issue of unconscionability are wholly inadequate.  However, I dissent from Part IID of the majority opinion because the undisputed facts from the record prove that the premarital agreement is substantively unconscionable as a matter of law because it is one-sided and imposes a severe hardship on Sandra Sailer.

[¶63] North Dakota is unique in its consideration of the unconscionability of premarital agreements.  As the Majority recognizes, when North Dakota adopted the Uniform Premarital Agreement Act in 1985, it also enacted a separate provision on unconscionability.  
See
 1985 N.D. Sess. Laws ch. 190, §§ 1-9.  The Uniform Premarital Agreement Act includes a provision that precludes enforcement of a premarital agreement if: 

The agreement was unconscionable when it was executed and, before execution of the agreement, that party:

(1) Was not provided a fair and reasonable disclosure of the property or financial obligations of the other party;

(2) Did not voluntarily sign a document expressly waiving any right to disclosure of the property or financial obligations of the other party beyond the disclosure provided; and

(3) Did not have notice of the property or financial obligations of the other party.

N.D.C.C. § 14-03.1-06(1)(b).

[¶64] While the Uniform Premarital Agreement Act precludes enforcement of an unconscionable premarital agreement if certain provisions are met, the Legislative Assembly clearly indicated that this provision did not go far enough.  John McCabe, a representative of the National Committee on Uniform State Laws, appeared before the Judiciary Committee on January 23, 1985.  
Hearing on S.B. 2174 Before the Senate Judiciary Comm.
, 49th N.D. Legis. Sess. (Jan. 23, 1985) (testimony of John McCabe).  He presented the contents of the Uniform Premarital Agreement Act and urged the committee to adopt the uniform act.  
Hearing on S.B. 2174
, 
supra
 (Jan. 23, 1985) (testimony of John McCabe).  McCabe explained that the Uniform Premarital Agreement Act contained a provision that would render a premarital agreement unenforceable if it was unconscionable.  
Hearing on S.B. 2174
, 
supra
 (Jan. 23, 1985) (testimony of John McCabe).  McCabe explained that unconscionability is a “contract between parties of unequal bargaining power, where one party has created a contract so onerous to the other party that we cannot in clear conscience regard it as a fair bargain — so we call that contract unconscionable.”  
Hearing on S.B. 2174
, 
supra
 (Jan. 23, 1985) (testimony of John McCabe).  Several legislators questioned McCabe about the Uniform Premarital Agreement Act, including Senator Olson who posed a hypothetical question about the enforcement of a one-sided premarital agreement.  
Hearing on S.B. 2174
, 
supra
 (Jan. 23, 1985) (testimony of Sen. John Olson).  Senator Olson asked, “What would happen if a man and a woman married and the premarital agreement provided that he gets everything — everything he earns — everything from his business.  He is just responsible for child support.  There she is stuck; everything is in his name.  They get a divorce.”  
Hearing on S.B. 2174
, 
supra
 (Jan. 23, 1985) (testimony of Sen. John Olson).  McCabe responded that the first question is “is it an unconscionable agreement?”  
Hearing on S.B. 2174
,
 supra
 (Jan. 23, 1985) (testimony of John McCabe).  McCabe continued, “I think looking at the terms of it, you’d probably be in a situation where you are saying that it is an unconscionable agreement.” 
Hearing on S.B. 2174
, 
supra
 (Jan. 23, 1985) (testimony of John McCabe).  He then stated, “Then you’d ask: is there fair and reasonable disclosure of property or a waiver of the disclosure.”  
Hearing on S.B. 2174
, 
supra
 (Jan. 23, 1985) (testimony of John McCabe).  McCabe explained that if there was disclosure, even if it is unconscionable, it would probably be enforceable.  
Hearing on S.B. 2174
, 
supra
 (Jan. 23, 1985) (testimony of John McCabe).  Senator Olson responded, “I’m a little bothered by that because I think there is a lot of accumulation that is not known up front. I guess I’m a little bothered by the fact that that could happen.”  
Hearing on S.B. 2174
, 
supra
 (Jan. 23, 1985) (testimony of Sen. John Olson). 

[¶65] When the Senate Judiciary Committee met to discuss the bill on January 28, 1985, legislators expressed their concerns with the unconscionability provision in the Uniform Premarital Agreement Act.  
Hearing on S.B. 2174
, 
supra
 (Jan. 28, 1985).  Senator Olson expressed that “he has reservations about this bill, and is bothered about the unconscionable part of it.”  
Hearing on S.B. 2174
, 
supra
 
(Jan. 28, 1985) (testimony of Sen. John Olson).  Senator Stenehjem indicated that “he has problems with unconscionable also.”  
Hearing on S.B. 2174
, 
supra
 (Jan. 28, 1985) (testimony of Sen. Wayne Stenehjem).  Senator Olson later stated that “he has trouble with unconscionable, but thinks the bill has merit.”  
Hearing on S.B. 2174
, 
supra
 (Jan. 28, 1985) (testimony of Sen. John Olson).  Senator Lashkowitz expressed that “he thinks this is a good mechanism but it needs work.”  
Hearing on S.B. 2174
, 
supra
 (Jan. 28, 1985) (testimony of Sen. Herschel Lashkowitz).

[¶66] The Judiciary Committee met again on February 6, 1985, and moved to amend the bill to add a subsection specifically on unconscionability.  
Hearing on S.B. 2174
, 
supra
 (Feb. 6, 1985).  The section is entitled “Enforcement of unconscionable provisions” and provides:

Notwithstanding the other provisions of this chapter, if a court finds that the enforcement of a premarital agreement would be clearly unconscionable, the court may refuse to enforce the agreement, enforce the remainder of the agreement without the unconscionable provisions, or limit the application of an unconscionable provision to avoid an unconscionable result.

N.D.C.C. § 14-03.1-07.  The committee voted unanimously to attach the amendment to the bill and moved that the bill be passed as amended.  
Hearing on S.B. 2174
, 
supra
 
(Feb. 6, 1985).

[¶67] The additional provision for unconscionability of a premarital agreement goes further than the provision for unconscionability under the Uniform Premarital Agreement Act.  It places no restrictions on what is required to find a premarital agreement unconscionable.  The legislative enactment is distinguishable from the Uniform Premarital Agreement Act that limits the enforcement of unconscionable premarital agreements only if three requirements are met.  
See
 N.D.C.C. § 14-03.1-

06(1)(b); 
see also
 Jana Aune Deach, Case Comment, 
Premarital Settlements: Till Death Do Us Part — Defining the Enforceability of the Uniform Premarital Agreement Act in North Dakota, In re Estate of Lutz
, 563 N.W.2d 90 (N.D. 1997), 74 N.D. L. Rev. 411, 423 (1998) (concluding that several states have mitigated the seemingly harsh standards of the Uniform Premarital Agreement Act, including North Dakota, which amended the statute to address enforcement of unconscionable premarital agreements).  Through the enactment, the Legislative Assembly expressly provided that premarital agreements should not be enforced if they are unconscionable regardless of whether the parties had fair and reasonable disclosure of the property and financial obligations of the other party before entering into the agreement.  
See
 1985 N.D. Sess. Laws ch. 190, § 7.

[¶68] In this case, the district court found “[t]he agreement [was] not one-sided as to be unenforceable” and concluded that the premarital agreement was conscionable as a matter of law.  It is difficult to imagine a premarital agreement more one-sided than this agreement.  This is precisely the factual scenario, whereby one spouse gets everything and the other gets nothing, that legislators expressed concern about when N.D.C.C. ch. 14-03.1 was enacted.  The premarital agreement provided that not only all of Curtis Sailer’s assets, investments, and property would remain his separate property, but all liquidations and re-investments from that property would also remain his separate property.  The premarital agreement also provided that any earnings from either spouse’s services, skills, efforts, and work would be the separate property of the party to whom the earnings and income are attributable.  Likewise, any inheritance or gift would be considered each spouse’s separate property.  The premarital agreement provided that, in the event of divorce, neither party would be entitled to insurance or retirement benefits from the other party.

[¶69] Under N.D.C.C. § 14-05-24(1), “[w]hen a divorce is granted, the court shall make an equitable distribution of the property and debts of the parties.”  Sandra Sailer gets none of the marital estate under the premarital agreement unless Curtis Sailer placed property in joint tenancy with her.  Under N.D.C.C. § 14-05-25, the court, in rendering the decree of divorce, may assign the homestead to a party and may require either party to give reasonable security for making any payments ordered in the divorce.  Sandra Sailer gave up all of her rights under this law in the premarital agreement.  Under N.D.C.C. § 14-05-24.1, “the court may require one party to pay spousal support to the other party for any period of time.”  Sandra Sailer does not receive any spousal support under the premarital agreement.  Under N.D.C.C. § 26.1-

36-23.1(2), every health insurance policy must contain a provision that permits continuation of coverage of the insured’s former spouse upon entry of a decree of divorce, if the decree requires the insured to provide continued coverage for that person for up to thirty-six months.  Sandra Sailer gave up her right to this support from her former husband under the premarital agreement.  Under N.D.C.C. § 30.1-

04-02, a decedent’s surviving spouse is entitled to an intestate share and, under N.D.C.C.  § 30.1-05-01, has a right of elective share in the decedent’s estate.  Sandra Sailer has no rights to any of Curtis Sailer’s estate under the premarital agreement.

[¶70] When the parties signed the premarital agreement, Sandra Sailer had no assets and was on welfare; Curtis Sailer had $421,703.52 in assets, investments, and property.  During the parties’ marriage, Curtis Sailer worked full time for Dakota Gasification, earning approximately $67,807.00 in 2005.  Sandra Sailer earned $4,520.04 in 2005.  Over the course of the parties’ nearly fifteen-year marriage, Sandra Sailer worked several part-time jobs and earned approximately $66,000, which averages out to be $5,077.00 a year.  At the time of trial, Sandra Sailer was working three jobs and her actual net monthly income was $774.21. Out of that monthly income, she was ordered to pay Curtis Sailer $232.00 a month for child support, leaving her $542.21 a month on which to live.   When the parties separated, Curtis Sailer disclosed he had accumulated approximately $800,000 in net assets including a retirement account, investments, and property.  In fact, Curtis Sailer’s assets had nearly doubled during his marriage to Sandra Sailer.  Included in Curtis Sailer’s assets was a 401k from his employment that he admitted was worth $648,465.26.  Shortly after Curtis Sailer filed for divorce, Sandra Sailer submitted a financial statement and affidavit stating she was receiving welfare benefits, had no money on hand, $50 in deposits in the bank, and she and Curtis Sailer had stocks and bonds in the amount of $200 in both their names.  After the parties separated, Sandra Sailer invested $959 in a 401k, however that money was no longer in the 401k at trial because Sandra Sailer testified she had to use it to pay rent.  The undisputed facts in the record show, as a matter of law, that the premarital agreement was unconscionable as enforced.  Sandra Sailer is in poverty at the end of a fifteen-year marriage and three children. 

[¶71] In addition to N.D.C.C. § 14-03.1-07, which expressly provides that unconscionable agreements should not be enforced, this Court’s case law also indicates the premarital agreement is unconscionable and, therefore, unenforceable.  In 
Binek v. Binek
, we explained that courts have considered unconscionability of a premarital agreement at both the time of execution of the premarital agreement and at the time of divorce.  2004 ND 5, ¶ 11, 673 N.W.2d 594.  This Court, in 
Binek
, considered that when the parties married Theodore Binek’s net worth was $600,000 and Ruth Binek’s net worth was $30,000.  
Id.
 at ¶ 2.  When the parties divorced, Theodore Binek’s net worth was approximately $200,000 and Ruth Binek’s $30,000 had been depleted.  
Id.
 at ¶ 3.  This Court concluded the premarital agreement was not unconscionable when it was executed because the agreement provided that Ruth Binek could keep her premarital assets and allow them to grow, and Theodore Binek was obligated to support her during the marriage.  
Id.
 at ¶ 12.  The Court also concluded the premarital agreement was not unconscionable when it was enforced “because it did not govern the parties’ rights regarding spousal support.”  
Id.
 at ¶ 12.  The Court explained, “By not addressing spousal support and allowing Ruth Binek to keep her assets separate from Theodore Binek’s, the agreement created enough leeway to avoid an unconscionable result based upon the parties’ circumstances at the time of dissolution.”  
Id.

[¶72] There is no such provision in this premarital agreement.  After approximately fifteen years of marriage, enforcement of the premarital agreement leaves Sandra Sailer with no real property, investments, retirement accounts, or assets.  Enforcement of the agreement means she does not receive any spousal support, share in increases in assets acquired during the marriage, or share in the marital home.  The parties in 
Binek
 each had some assets when they married, and, although there was a disparity in the value of the parties’ assets, the disparity was not as significant as in this case.  Furthermore, Ruth Binek was allowed to request spousal support upon termination of the marriage.  In this case, Sandra Sailer has no assets, is barred from receiving spousal support, and her “circumstances at the time of dissolution” were incredibly dire.  She has few employment skills, which from the record amount to answering telephones and filing.

[¶73] Further, this Court’s opinion in 
Weber v. Weber
 supports the conclusion that this premarital agreement is unconscionable.  In 
Weber v. Weber
, we concluded a property settlement agreement that was entered into by a divorcing couple who had been married twenty-seven days was unconscionable and unenforceable.  1999 ND 11, ¶ 19, 589 N.W.2d 358.  The property settlement awarded the wife the husband’s residence that he had owned before marriage, which was valued at $70,000.  
Id.
 at ¶¶ 2, 16.  We concluded the property settlement agreement was unconscionable because the agreement was one-sided, placed a great hardship on the husband, was formed hastily, and, at the time the parties signed the property settlement, the wife was represented by counsel, while the husband was not.  
Id.
 at ¶¶ 15-18.

[¶74] In this case, Curtis Sailer was represented by counsel, while Sandra Sailer was not.  “Although the parties to a premarital agreement may proceed without counsel, this is a factor that is relevant to a finding of unconscionability under the [Uniform Premarital Agreement Act].”  
Marital Property Law
, Effect of Antenuptial Agreement, § 26:9, at 8 (2008 supp.).  Additionally, as explained earlier, the agreement is clearly one-sided, as it provides Curtis Sailer is to receive over $800,000 in assets, while Sandra Sailer receives basically no assets, and no spousal support.  Furthermore, Curtis Sailer has a well-paying job, where he earns six times what Sandra Sailer earns, and he receives health insurance and retirement benefits.  The enforcement of the premarital agreement places a great hardship on Sandra Sailer.

[¶75] Finally, in 
Weber
, we stated it is appropriate for a district court to consider the 
Ruff-Fischer
 guidelines when determining unconscionability of a settlement agreement of divorcing parties. 1999 ND 11, ¶ 17, 589 N.W.2d 358.  We acknowledged that the 
Ruff-Fischer
 guidelines are not the standard in a domestic relations case to determine unconscionability of a settlement agreement, however, we explained that application of the guidelines may be helpful “because a domestic relations agreement should not be scrutinized in the same way as a business contract.”  
Id.
 While the district court is not required to consider the 
Ruff-Fischer
 guidelines when determining the unconscionability of this premarital agreement, consideration of the guidelines may assist the court in determining whether the agreement is so one-sided as to not be enforceable.

[¶76] This Court’s holding in 
Crawford v. Crawford
 also supports a finding that the premarital agreement is unconscionable.  In 
Crawford
, we considered whether the district court abused its discretion when it denied Leslie Crawford’s motion to vacate a divorce judgment.  
Crawford v. Crawford
, 524 N.W.2d 833, 836 (N.D. 1994).  Leslie Crawford and Kenneth Crawford were married for approximately fifteen years, had four children, and at the time of the divorce, Kenneth Crawford was a medical doctor earning $130,000 a year.  
Id.
 at 834.  At the time of the divorce, Leslie Crawford was earning $3,600 a year.  
Id.
  Without the advice of counsel, Leslie Crawford entered into a stipulated divorce agreement with Kenneth Crawford, whereby Kenneth Crawford was awarded custody of the four children, received the parties’ home, paid for Leslie Crawford’s vehicle, attorney’s fees, and paid her $250 a month spousal support for a six-month period.  
Id.
 at 835.  Leslie Crawford was to pay Kenneth Crawford $15 a month in child support and received visitation rights.  
Id.
  The district court entered a judgment based on this stipulation.  
Id.
  Five months after the judgment was entered, Leslie Crawford retained an attorney and moved for relief from the judgment.  
Id.
  The district court denied her motion, concluding Leslie Crawford was an intelligent person and there was no evidence of fraud, deceit, coercion, or misrepresentation by Kenneth Crawford.  
Id.
  On appeal, Leslie Crawford argued the divorce stipulation agreement was so one-sided and unjust that it must be deemed the product of either Kenneth Crawford’s overreaching or her incapacity to understand it.  
Id.
  We agreed with Leslie Crawford and concluded the stipulation was “so one-sided and creates such hardship that it is unconscionable.”  
Id.
  We acknowledged that stipulated agreements can provide prompt and peaceful resolution of disputes, but held, “when it is disclosed that a judgment is so blatantly one-sided and so rankly unfair under the uncovered circumstances[,] [ ]courts should not enforce it.”  
Id.
 at 836.  This Court reversed the district court’s denial of the motion to vacate the divorce judgment, concluding “[w]hether a party has agreed to the terms of a stipulation becomes irrelevant in light of the damage enforcement of an unconscionable decree would do to the duty and reputation of courts to do justice.  Just as courts will not enforce an agreement that is illegal, so too courts should vacate judgments that are unconscionable.”  
Id.
 

[¶77] This case is substantially similar to 
Crawford
.  Like the husband in 
Crawford
, Curtis Sailer earns significantly more than Sandra Sailer, has job security, skills, and a home.  An even greater disparity exists here as Curtis Sailer has over $800,000 in assets and Sandra Sailer has virtually no assets.  As in 
Crawford
, the present agreement is “so blatantly one-sided and so rankly unfair” that it should not be enforced.  Equally applicable to the terms of this premarital agreement is the statement in 
Crawford
: “Whether a party has agreed to the terms of a stipulation becomes irrelevant in light of the damage enforcement of an unconscionable decree would do to the duty and reputation of courts to do justice.”  
Id.

IV

Custody

[¶78] I respectfully dissent from Part IV of the majority opinion.  The Majority, at ¶ 34, acknowledges that “[g]enerally, a ‘court cannot make the report of an independent investigator the conclusive basis of its decision regarding the custody of the children.  The reason for this rule is usually expressed by the phrase that the trial court cannot delegate to anyone the power to decide questions of child custody.  
Owan v. Owan
, 541 N.W.2d 719, 722 (N.D. 1996) (citations omitted).”  Although the Majority correctly states the rule pertaining to custody investigators, it declines, without analysis, to apply the rule to the present case.  The district court held, “[t]he Court has reviewed all of the ‘best interests’ factors in Section 14-09-06.2, N.D. Cent. Code, as well as the custody investigation report and update of [the custody investigator].  The Court agrees with [the custody investigator’s] analysis and conclusions and finds a, b, c, d, h, and j favor [Curtis Sailer].”  The district court provided no further analysis or explanation to support its award of custody to Curtis Sailer.  The Majority argues the district court’s conclusion is acceptable because it “observed the custody investigator testify at trial.”  
See
 Majority, at ¶ 35.  We have repeatedly stated a district court should not regard a custody investigator or guardian ad litem’s testimony and recommendation as conclusive.  
See
 
Nefzger v. Nefzger
, 1999 ND 119, ¶ 20, 595 N.W.2d 583; 
Schmaltz v. Schmaltz
, 1998 ND 212, ¶ 9, 586 N.W.2d 852; 
Hogan v. Hogan
, 2003 ND 105, ¶ 10, 665 N.W.2d 672.  The district court abdicated its responsibility to make the custody decision when it regarded the custody investigator’s opinion as conclusive, which it is not permitted to do.  
See
 24A Am. Jur. 2d 
Divorce and Separation
 § 883 (2008) (“The court cannot delegate to anyone the power to decide custody.  It cannot make the report and conclusions of its investigator conclusive.”); 27C C.J.S. 
Divorce
 § 1023 (2008) (“The [investigator’s] recommendations are not conclusive.”).  

[¶79] Furthermore, I am unable to distinguish this case from 
Owan v. Owan
.  In 
Owan
, the district court found, “The Court gives [the social worker’s] testimony and opinion a great deal of credibility.  The Court has reviewed North Dakota Century Code 14-09-06.2 and does concur with [the social worker’s] findings as follows:  the allegations of [the husband’s] physical altercations appear to be minor.  In most cases, [the wife] has acted and [the husband] has reacted.”  
Owan
, 541 N.W.2d at 721.  We concluded the district court could not merely adopt the findings of the expert.  
Id.
 at 722.  The district court in this case abdicated its role even more so than did the court in 
Owan
.  Here, the district court provided absolutely no analysis and adopted the custody investigator’s findings completely.  The court did not analyze the applicable factors nor explain its rationale for awarding custody of the children to Curtis Sailer.  Rather, it merely stated it had reviewed the statute and custody investigator’s report and agreed with the investigator’s analysis and conclusions.  This is wholly inadequate.  

[¶80] Finally, I also dissent from the Majority’s analysis of factor (d) of the best interest factors.  The Majority, at ¶ 46, acknowledges that the district court “may have inadequately analyzed factor d,” however, it concluded that the weight of the other best interest factors favored Curtis Sailer.  Initially, I note the district court did not analyze factor (d) at all.  Rather, it merely stated it agreed with the custody investigator’s report and analysis on all the factors.  Secondly, the custody investigator’s analysis on this factor was an incorrect application of the law.  As the Majority noted, a district court should analyze more than the physical structure or geographic location of the parties’ homes when applying factor (d).  While the Majority acknowledges that the district court and custody investigator may have inadequately analyzed this factor, it did not remand for the district court to apply the relevant facts to the law as clarified by this Court.  In 
Gietzen v. Gabel
, we explained that when this Court is “unable to say the court correctly applied the law for [a best interest factor],” the custody award should be reversed and remanded for findings under the correct application of one of the best interest factors.  2006 ND 153, ¶ 19, 718 N.W.2d 552.  Likewise, in 
Goter v. Goter
, this Court concluded the district court applied the wrong test when deciding whether it should award custody to a psychological parent over a natural parent.  1997 ND 28, ¶ 10, 559 N.W.2d 834.  Because the district court applied the wrong legal test, this Court reversed and remanded the matter for the district court to apply the correct test for determining custody.  
Id.
 at ¶¶ 11-12.  In 
P.A. v. A.H.O.
, the mother argued the best interest factors should be given equal weight and custody should be awarded to the party who has the most factors weighing in her favor.  2008 ND 194, ¶ 15, 757 N.W.2d 58.  Our Court stated, however, that we have not interpreted “equal consideration” to mean “a mathematical formula by which the factors are added up and the person with the most factors in their favor is awarded custody.”  
Id.
  We said some factors may prove more important in one situation than another.  
Id.
  Furthermore, in 
Klein v. Larson
, 2006 ND 236, 724 N.W.2d 565, in a concurring and dissenting opinion which I joined, Justice Crothers explained that when the district court misapplies the law, this Court should remand so the district court can complete its fact-finding function.  He stated:

A misapplication of law generally warrants reversal of the judgment and remand so the district court can apply relevant facts to the law as clarified by this Court. Unless the facts are undisputed, a district court's misapplication of law does not warrant this Court taking over the fact-finding function and deciding the case in lieu of the district court. Yet I believe the majority has done just that by re-

weighing evidence and by making its own findings under statutory factors (d), (f) and (m). Majority opinion at 
¶¶ 
14, 17-21, and 25-27.

. . . . 

Here, the law was misapplied below. The district court needs to correct that error on remand by applying the disputed facts of this case to the law this Court has directed be used. But instead of remanding to let the district court complete its work, the majority is adjudicating this case under the set of facts that the majority finds persuasive. Doing so, I believe the majority is improperly stepping into the fact-finding role normally reserved to the district court. I therefore respectfully dissent from those portions of the opinion adjudicating facts and ordering entry of judgment for Larson.

Klein
, 2006 ND 236, ¶ 34, 724 N.W.2d 565 (Crothers, J., concurring in part and dissenting in part).  These cases all indicate that when a district court incorrectly applies the law, the case should be remanded so it can make findings in accordance with the correct application of the law.  The same is true of this case.  Thus, I would reverse the district court’s award of custody to Curtis Sailer and remand for the district court to appropriately analyze factor (d).

[¶81] Mary Muehlen Maring